**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND and Central States, Southeast and Southwest Areas Health and Welfare Fund, et al., Plaintiffs,**

v.

**CHICAGO–ST. LOUIS TRANSPORT CO., Defendant.**

**No. 80 C 850.**

United States District Court, N. D. Illinois, E. D.

March 4, 1982.

**7.** *See, Codispoti v. Howard,* 589 F.2d 135 (3d Cir. 1978); *United States ex rel. Geisler v. Wal-* *ters,* 510 F.2d 887 (3d Cir. 1975).

James L. Coghlan, William J. Nellis, Ken J. Weinberger, Thomas C. Nyhan, Coghlan, Joyce & Nellis, Chicago, Ill., for plaintiffs.

J. Kevin Hennessy, Naphin, Banta & Cox, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Health Fund") (collectively "Funds") and the individual Fund trustees sue Chicago-St. Louis Transport Company ("Transport") for alleged delinquencies in contributions owed to Funds. Funds have moved for summary judgment, and Transport has filed a cross-motion for summary judgment on one of Funds' three claims. For the reasons stated in this memorandum opinion and order, Funds' motion is denied and Transport is granted summary judgment on two of the claims.

*Facts*

Since at least 1970 (except for the brief hiatus described in the next paragraph) Transport has been a member of the Motor Carriers Labor Advisory Council ("MCLAC"), a multi-employer association that negotiates collective bargaining agreements on behalf of participating employers. In 1973 MCLAC negotiated such an agreement (the "1973 Agreement") with Local Union Nos. 50, 179 and 600 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters"). Under the 1973 Agreement, which was to expire March 31, 1976,[1] contributions were to be made to Funds effective July 1, 1974.

In January 1976 Transport withdrew from MCLAC. As March 31 approached it became evident that some Transport employees were dissatisfied with Teamsters. As a result the 1973 Agreement was permitted to run out and new negotiations were not undertaken. Dissatisfaction with Teamsters culminated with the May 25, 1976 filing with the NLRB of a petition seeking decertification of Teamsters Locals Nos. 179 and 50. In an August 27, 1976 decertification election Transport's employees voted to retain Teamsters as their collective bargaining representative. Transport then reaffiliated with MCLAC to negotiate a new collective bargaining agreement. Negotiations resulted in a new agreement (the "1977 Agreement") in June 1977, effective August 28, 1977. Plaintiffs' claimed delinquencies fall into three categories:

(1) During the January 1, 1975 to April 3, 1976 period as well as from August 28, 1977 to the present, deficiencies were caused by Transport's failure to report to Funds accurate and timely changes in employees' status (via "EBCC–1" Forms).

(2) During the gap period from April 4, 1976 to August 27, 1977 Transport made payments ("under protest") to the Health

---

1. Plaintiffs' supporting memorandum refers to an April 3 expiration date, but the documents (such as the NLRB decertification petition referred to later in the text) as well as Transport's memorandum consistently speak of March 31. It may be that *payment* for the last period covered by the agreement was made through April 3, so that the apparent discrepancy is non-existent.

Fund but not the Pension Fund. Plaintiffs contend Transport remained responsible for both kinds of contributions by virtue of the 1973 Agreement.

(3) Under the 1977 Agreement Transport made payments to Funds at "split rates" (lower contributions were made for employees hired after a certain date). Plaintiffs contend split rate contributions are improper and contributions should have been made at the full rate for all employees.

### Untimely Submission of Forms

It is undisputed that Transport was required to submit forms to Funds indicating all changes in employee status. Plaintiffs contend Transport failed timely to submit certain forms, creating contribution deficiencies.

■ First plaintiffs have not proved that the late submission of such forms did result in delinquency. This is after all a motion for summary judgment, requiring affidavits to take the place of admissible evidence, not conclusory assertions. On the face of things, lateness in reporting might cause lateness in contributions, but not their total absence; plaintiffs must present more facts. Thus even if tardiness were proved plaintiffs would have failed to meet their burden of demonstrating that the alleged delinquencies exist in fact.

But even aside from that point plaintiffs cannot prevail at this pretrial stage. In support of their summary judgment motion plaintiffs have submitted the affidavit of Funds' Director of Operations Accounting Division George Psaras, who states Transport has frequently been late in reporting employee status changes. But Transport has responded with the affidavit of its Vice President and General Manager Robert Gootee, who says Transport has never been late in reporting such changes. Clearly a genuine issue of material fact remains. Plaintiffs' motion for summary judgment must be denied.

2. This is Paragraph 8 in the Joint Application.

### Hiatus Period

Any discussion of Transport's possible responsibility for contributions during the hiatus period requires analysis of the contractual agreements among Teamsters, Funds and Transport. Teamsters and Transport have entered into three agreements:

(1) Their collective bargaining agreements (both the 1973 and 1977 Agreements) cover rates of pay and other terms and conditions of employment. They provide for health and welfare contributions and pension contributions, but they do not spell out where the contributions are to be made or the terms of those contributions.

(2) Their "Participation Agreement" (on the Pension Fund's standard form) incorporates and agrees to be bound by the Pension Fund Trust Agreement and sets the effective date of participation and the level of pension contributions.

(3) Their "Joint Application" (on the Health Fund's standard form) accomplishes the same purposes as to health and welfare contributions.

Two identical paragraphs of the latter two agreements are important in determining whether an employer may be responsible for contributions after expiration of a collective bargaining agreement like the 1973 Agreement:

1. The Union and the Employer agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement creating said CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION [HEALTH AND WELFARE] FUNDS, all of the rules and regulations heretofore and hereafter adopted by the Trustees of said Trust Fund pursuant to said Trust Agreement and all other of the actions of the Trustees in administering such Trust Fund in accordance with the Trust Agreement and rules adopted.

\* \* \* \* \* \*

7.[2] This Participation Agreement [Joint Application] shall continue in full force

and effect during the life of the current collective bargaining agreement between the parties and during all renewals and extensions thereof; subject only to increases in the rate of contributions as required by such renewals or extensions. The obligation to make contributions to the Fund shall be terminated when and if such contributions are no longer required by a collective bargaining agreement between the parties.

One other contractual provision is critical to the analysis—this one in the Funds' Trust Agreement, incorporated by reference into the Participation Agreement and Joint Application and hence into the 1973 Agreement. Trust Agreement Article III, Section 1 provides: [3]

Amount of Contributions—Each Employer shall make continuing and prompt payments to the Trust Fund as required by the applicable Collective Bargaining Agreement between the parties. The obligation to make such contributions shall continue during periods when the Collective Bargaining Agreement is being negotiated, but such contributions shall not be required in cases of strike after contract termination, unless the parties mutually agree otherwise.

Had Transport and Teamsters begun negotiating for a new collective bargaining agreement in anticipation of the 1973 Agreement running out, or even had they begun such negotiations immediately on expiration of the 1973 Agreement, the question would be a simple one. Under the Trust Agreement employers are expressly obligated to continue contributions during such a period of negotiation. It is true that the Participation Agreement and Joint Application provide for contributions "during the life" of a collective bargaining agreement and "during all renewals and extensions." But what the parties have effectively done by incorporating the Trust Agreement, with its provision for continued contributions during negotiating periods, is to make those periods part of the "life" of the collective bargaining agreement or an "extension" of that agreement—at least for the limited purpose of employee benefit contributions.

■ Indeed, even in the absence of the Trust Agreement provision the answer would appear to be the same as a matter of labor law. It is unlawful for an employer to make unilateral changes in a contract on any matters that are the subject of mandatory bargaining while an agreement is being negotiated. *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). Pension rights are subjects of mandatory bargaining. *Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th Cir. 1948). Other fringe benefits stand on the same footing. It is therefore an unfair labor practice for an employer to terminate pension or health and welfare fund contributions after a contract has terminated if negotiations for a new contract are under way. *Peerless Roofing Co., Ltd. v. NLRB*, 641 F.2d 734 (9th Cir. 1981).

■ But the situation here is quite different. No negotiations took place before or just after expiration of the 1973 Agreement. In fact, shortly after that expiration a decertification petition was filed, and as a matter of labor law it would have been *unlawful* for Transport to have undertaken any negotiations.

■ Thus both possible rationales for continued contributions disappear. As a matter of contract, no provision of the 1973 Agreement, the Participation Agreement, the Joint Application or the Trust Agreement required contributions when the 1973 Agreement terminated and no negotiations had begun. And as a matter of labor law, it is not unlawful for an employer to cease contributions when a collective bargaining agreement ends if for any reason (such as strike, impasse in negotiations or decertification proceeding) there is no duty to negotiate. *Ellex Transportation, Inc.*, 217 NLRB 750, 759 (1975). No basis therefore existed for requiring Transport to make

---

**3.** Because the Trust Agreement and this provision antedate the 1973 Agreement, they were part of the contractual relationship from the beginning.

contributions to Funds during the gap period.[4]

Nor is the result changed by the commencement of negotiations for a new collective bargaining agreement some time after the decertification proceeding was finished:

(1) As a matter of contract law, once the 1973 Agreement terminated with no extension, renewal or negotiations, all contractual arrangements among Funds, Teamsters and Transport ceased. Mere commencement of negotiations thereafter could not revive those terminated contractual arrangements.

(2) As a matter of labor law, Transport was permitted to terminate all payments once the 1973 Agreement ran out because no negotiations had commenced and a decertification proceeding had begun. All that was required of Transport once *new* negotiations commenced was that it not change the status quo. At that point the status quo involved no contributions to the pension fund.

This Court finds no basis for requiring contributions by Transport during the hiatus period between the two collective bargaining agreements.

### Split-Rate Dispute

In connection with the 1977 Agreement Teamsters and Transport negotiated a Rider containing a split-rate formula for Fund contributions. Full contributions were required for all regular employees on the seniority list as of March 31, 1976 but lower rates of contribution were provided for employees hired after April 1, 1976. Although the parties agreed on those terms June 13, 1977 the written Rider was not executed until some time in August or September 1977.

Since the time of the Rider Transport's Fund contributions have been made under the split-rate agreement. By definition the total contributions have been lower than if Transport had contributed at the full rate for all employees.

■ On August 17, 1977 the full Board of Trustees of the Pension Fund adopted a resolution under which their staff was "authorized and directed to refuse to accept any collective bargaining agreement or renewal thereof if the terms and conditions thereof provide" for split-rate contributions.[5] Pension Fund claims that under the resolution the split-rate agreement was improper and Transport is liable for the full contribution rate for all employees. Transport on the other hand contends that the 1977 Agreement Rider controls and it has complied fully with the Rider's requirements.

This controversy poses no real difficulty. For Pension Fund to override the unambiguous split-rate agreement negotiated by the parties, it can rely only on the Participation Agreement's provision by which Teamsters and Transport "agree to be bound by ... all of the terms of the Trust Agreement ... [and] all of the rules and regulations ... *hereafter* adopted by the Trustees ... pursuant to said Trust Agreement...." (emphasis added). Such a reading would be intolerable in contract terms. Contribution rates are set by collective bargaining, just as they were here. Trustees of the fund receiving the contributions may set regulations as to how their fund is run, but they have no delegated authority to change the previously-negotiated rates unilaterally.

Indeed Trustees' resolution does not actually set contribution rates. It simply declines to administer contributions from an

---

**4.** Plaintiffs' heavy reliance on *Central States Southeast and Southwest Areas Pension Fund v. Hitchings Trucking, Inc.*, 472 F.Supp. 1243 (E.D.Mich.1979) seems mistaken for two reasons:

(1) It appears that negotiations there took place after termination of the contract.
(2) There is a strong indication the contract had not in fact expired because it contained a self-renewing provision.

But if the case were not distinguishable this Court would not follow it for the reasons stated in the text.

**5.** Trustees of the Health Fund passed an identical resolution September 15, 1977. However plaintiffs assert no Health Fund delinquencies on that basis.

employer committed to a split-rate arrangement. Nothing in the resolution permits Trustees to raise a split-level contribution rate, as distinct from their right to decide not to accept such contributions.

Thus no contractual provision allows this Court to require Transport to pay contributions at a rate above that required by the 1977 Agreement. Plaintiffs' remedy is and always has been to refuse to take Transport's money. Transport is entitled to summary judgment on the issue of contributions over and above the split rates established by the Rider.

### Conclusion

Factual issues preclude summary judgment on plaintiffs' claim for delinquencies arising from Transport's allegedly untimely submission of EBCC–1 Forms. There are no genuine issues of material fact, and Transport is entitled to a judgment as a matter of law, on each of the other disputes: the asserted delinquencies that arose during the hiatus period and by reason of the split-rate agreement. Transport is granted summary judgment on each of those issues.