# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3619/08-1200

_____

| | | |
|---|---|---|
| Cardinal Health 110, Inc., | * | |
| formerly known as Whitmire | * | |
| Distribution Corporation, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Cyrus Pharmaceutical, LLC, | * | Appeal from the United States |
| also known as Cyrus Pharmaceutical | * | District Court for the |
| Co., LLC, doing business as | * | Western District of Missouri. |
| Cyrus Pharmacy; Kian Shafe; | * | |
| Judith J. Shafe, | * | |
| | * | |
| Appellants, | * | |
| | * | |
| Kendallwood Investment, LLC; | * | |
| Kendallwood Retirement Homes, Inc., | * | |
| | * | |
| Defendants. | * | |

_____

Submitted: October 17, 2008
Filed: March 31, 2009

_____

Before RILEY, BOWMAN, and COLLOTON, Circuit Judges.

_____

RILEY, Circuit Judge.

Cardinal Health 110, Inc. (Cardinal) sued Cyrus Pharmaceutical, LLC (Cyrus), Judith Shafe (Ms. Shafe) and Kian Shafe (Mr. Shafe) (collectively, Shafes), Kendallwood Investment, LLC (KI), and Kendallwood Retirement Homes, Inc. (KRH) based upon a Credit Application and Agreement (Credit Agreement) for Cardinal's sale of pharmaceuticals to Cyrus. The district court[1] granted Cardinal summary judgment on claims of breach of contract, breach of guarantee, and action on account, and awarded Cardinal costs and attorney fees. Cyrus and the Shafes now appeal. We affirm.

## I.    BACKGROUND

In 2001, Cardinal and Cyrus entered into a contract in which Cardinal agreed to supply pharmaceuticals to Cyrus's nursing homes. The contract provided a security agreement for Cardinal. By January 2006, Cyrus owed Cardinal $135,000 on the contract. In light of this outstanding balance, Cardinal and Cyrus renegotiated their agreement by executing (1) a letter agreement extending the time for Cyrus to pay the outstanding $135,000 (Dating Agreement), and (2) a Credit Agreement.

Under the Dating Agreement, Cardinal agreed "to provide [Cyrus] with extended dating for a period of six (6) months in order to assist [Cyrus] in the expansion of its current business operations and assist with the impact of the new Medicare part D program." In return, Cyrus agreed to make payments of $45,000 each on May 15, 2006; June 15, 2006; and July 15, 2006. The Shafes accepted the Dating Agreement by signing it as the "owner/President" of Cyrus. Although the Shafes did not date their

---

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

signatures on the Dating Agreement, the record before us places the Dating Agreement execution between January 20, 2006, and January 31, 2006.[2]

Under the Credit Agreement, Cardinal agreed to supply pharmaceuticals to Cyrus on credit. However, the Credit Agreement involved three provisions in the event Cyrus failed to pay on the credit. First, Cyrus agreed to "pay all out-of-pocket expenses, including attorneys' fees and disbursements, incurred by Cardinal to collect any amounts due under [the Credit Agreement] or to otherwise enforce any of the terms of [the Credit Agreement]." Second, Cyrus granted Cardinal a security interest in all of Cyrus's "goods, equipment, inventory, accounts, accounts receivable and all general intangibles, books and records, computer programs and records, and other personal property, tangible or intangible, related to the foregoing." Finally, the Credit Agreement provided a section entitled "Guarantee" which set forth the following:

> The undersigned Principal(s) of Applicant, by reason of their interest in Applicant and as an inducement for Cardinal Health to extend credit to Applicant, hereby jointly and severally, irrevocably, and unconditionally guarantee to Cardinal Health and it subsidiaries, affiliates and successors (each a Guarantee Party) and assigns the prompt and full payment (and not merely the ultimate collectability) and performance of all obligation of Applicant to each Guaranteed Party, whether now existing or hereafter arising. The undersigned authorize Cardinal Health to verify this information and/or additional information by obtaining data from a credit reporting agency. If Applicant or its business is hereafter sold, this guaranty shall continue to all credit hereafter made available to that Applicant or its business (as the case may be) until such time as Cardinal Health has received 5 days advanced written notice (via certified mail, return receipt requested) that Applicant and/or Principal(s) will no longer

---

[2]The Dating Agreement states it applies to invoices up to January 20, 2006. Cardinal's Manager of Underwriting testified, and Cyrus and the Shafes admitted, the Dating Agreement was negotiated in January 2006, which would require execution by January 31, 2006.

be responsible for credit thereafter made available with the respect to that Applicant or its business.

THE UNDERSIGNED ACKNOWLEDGES THAT HIS/HER INDIVIDUAL CREDIT HISTORY MAY BE A FACTOR IN THE EVALUATION OF THE CREDIT HISTORY OF THE APPLICANT AND HEREBY CONSENTS AND AUTHORIZES THE USE OF A CONSUMER CREDIT REPORT ON THE UNDERSIGNED BY CARDINAL HEALTH FORM TIME TO TIME AS CARDINAL HEALTH MAY DEEM NECESSARY IN ITS CREDIT EVALUATIONS.

(spelling and grammar unaltered).

The Credit Agreement was executed on January 25, 2006, through three sets of signatures by both Ms. Shafe and Mr. Shafe. The first set of signatures were styled as an "Authorized Signature" which accepted the terms of the Credit Agreement, including the expenses and attorney fees provision, on behalf of Cyrus. The second set of signatures authorized Cardinal's security interest in Cyrus's goods and was executed as Cyrus's "owner/President." The third set of signatures executed the guarantee and was signed "By" the Shafes as "Principals."

In reliance on the Dating Agreement and Credit Agreement, Cardinal continued to fill Cyrus's orders. Cyrus never paid the Dating Agreement payments, and failed to pay Cardinal for the new orders. As a result, Cardinal sued Cyrus and the Shafes asserting claims of breach of contract against Cyrus, breach of guarantee against the Shafes, action on account against Cyrus, fraud against Cyrus, and alter ego against KI and KRH.

Cardinal moved the district court for partial summary judgment on the breach of contract, breach of guarantee, and action on account claims. On June 20, 2007, the district court granted the motion finding (1) the Credit Agreement and Dating

Agreement were one valid contract which made Cyrus liable on the contract and account, and (2) the Shafes were personally liable for all Cyrus's debt because the "Guarantee" was unambiguous, signed by the Shafes in their personal capacity, supported by consideration, and valid. Cardinal then moved the district court to dismiss Cardinal's remaining two claims without prejudice, and the district court granted the motion on October 31, 2007. That same day, an entry was made on the case's docket which read: "(Court only) ***Civil Case Terminated. (Morse, Judy) (Entered: 10/31/2007)."

On November 15, 2007, Cyrus and the Shafes filed a notice of appeal on the partial summary judgment motion, stating final judgment in the case had been entered on October 31, 2007. Five days later, on November 20, 2007, the district court entered judgment in the case. Cardinal then moved, on December 4, 2007, for costs and attorney fees under the Credit Agreement in the amount of $5,540.33 and $88,221.65, respectively. Cardinal's motion asserted final judgment was entered on November 20, 2007. On January 9, 2008, the district court partially granted Cardinal's motion and awarded Cardinal $5,540.33 in costs and $65,000 in attorney fees. The Shafes have now appealed the district court's grant of summary judgment to Cardinal on the breach of guarantee claim, and Cyrus and the Shafes challenge the district court's award of costs and attorney fees.

## II.    DISCUSSION
### A.    Breach of Guarantee Claim

The Shafes argue the district court erred in granting summary judgment on Cardinal's breach of guarantee claim because the district court (1) improperly stated and applied Missouri law, (2) misstated the facts and wrongly interpreted the guarantee to demonstrate unambiguously the Shafes' intent to be personally bound, and (3) erroneously found the guarantee was supported by consideration for Cyrus's preexisting debt of $135,000. "We review de novo a district court's grant of summary judgment, as well as its interpretation of state law and the terms of a contract." Ace

-5-

Elec. Contrs., Inc. v. Int'l Broth. of Elect. Workers, 414 F.3d 896, 899 (8th Cir. 2005) (citation omitted).

### 1.    Interpretation of Missouri Law

The Shafes first urge this court to reverse the district court's grant of summary judgment because the district court improperly relied upon dicta from Standard Meat Co. v. Taco Kid of Springfield, Inc., 554 S.W.2d 592 (Mo. Ct. App. 1977), to create a rule of strict liability in Missouri law that a signatory who signs a guarantee as a "principal" has unambiguously signed the guarantee in his or her personal capacity. The Shafes contend the district court's interpretation was erroneous because Missouri law does not have a rule of strict liability, but rather requires a court to analyze an individual's intent to be personally bound by a guarantee. The Shafes argue the district court's interpretation of Missouri law was an error of law which, by definition, constituted an abuse of discretion and requires reversal.

The Shafes' argument regarding the district court's interpretation of Taco Kid is misplaced. On de novo review, we interpret Missouri law independent of the district court, see Ace, 414 F.3d at 899, and can affirm the district court's grant of summary judgment based upon any reason supported in the record, see Christoffersen v. Yellow Book USA, 536 F.3d 947, 949 (8th Cir. 2008). We therefore address, under our own interpretation of Missouri law, whether the district court properly found there was no genuine issue of material fact regarding the Shafes' personal liability under the Guarantee.

### 2.    Intent of Personal Liability

Missouri subscribes to the following general rule regarding signatory liability on a guarantee:

> [W]here the principal is disclosed and the capacity in which the individual signs is evident, e.g., president, secretary, agent, the liability is the

-6-

principal's and not the individual signing for the principal. The presumption, in such cases, is, that it was the agent's intention to bind his principal and not to incur personal liability, and an agent will not be bound personally, except upon clear and explicit evidence of an intention to be bound. Of course, where the circumstances surrounding the transaction disclose a mutual intention to impose personal responsibility on the individual executing the agreement, the individual may be personally liable even though the form of the signature is that of the agent.

. . . .

The determinative issue here is whether, in view of the form of the signature to the agreement, the language of the so called guaranty clause is sufficient to manifest a clear and explicit intent by [the signatory] to assume a personal guaranty contract.

. . . .

[Missouri] therefore adopt[s] the policy that in order to hold a corporate officer individually liable in signing a contract of guaranty . . . the officer should sign the contract twice–once in his corporate capacity and once in his individual capacity. If the parties have mutually agreed and intended that the officer executing the contract for his corporation is to assume personal obligations thereunder, the simple but unequivocal act of manifesting such intent can be accomplished by having the officer also sign in his individual capacity.

Wired Music, Inc. of the Great Midwest v. Great River Steamboat Co., 554 S.W.2d 466, 468–71 (Mo. Ct. App. 1977) (citations and quotations omitted).

In Taco Kid, 554 S.W.2d at 593–94, the Missouri Court of Appeals found signatory liability on a two-sided document which included a credit application on one side and a guarantee on the other side. The guarantee required "a principal of the business" to guarantee payment of outstanding debts. Id. at 594. In two separate

instances, the guarantee was signed by shareholders and directors of the corporation who denoted themselves as either "president of Taco Kid of Springfield Mo, Inc." or "Pres." Id. The court held these identifiers did not engender any ambiguity, and the signatories had executed the guarantee in their individual capacities because the guarantee was completed by a "principal of the business" and there was no attempt or intent to enter the guarantee on behalf of the corporation. Id. at 595–96. The court also stated this interpretation was reasonable because an interpretation of the contract which would result in the corporation guaranteeing its own debt would be "redundant, illusory, absurd, and therefore unreasonable." Id. at 596 (citations and quotations omitted).

The Shafes claim the district court erred in granting summary judgment because the Guarantee does not evidence the Shafes' intent to be bound personally. The Shafes contend (1) the signature block in the Guarantee contains "By: Principals" language which evinces corporate capacity signatures, (2) the Guarantee does not contain personal pronouns indicative of personal liability, and (3) the Guarantee has "spelling errors, verb tense and/or conjugation errors, improper sentence structure and improper and/or confusing placement of modifiers and modifying phrases" which create ambiguities regarding the Shafes' intent, and such ambiguities should be construed against the drafter, Cardinal. The Shafes assert these deficiencies raise issues of fact regarding the Shafes' intent, which precludes summary judgment. We disagree.[3]

---

[3]The Shafes also take issue with the version of the Guarantee which the district court used. According to the Shafes, the district court used a modified or corrected version of the Guarantee, modified by the district court or corrected by Cardinal, which was inconsistent with the true language of the Guarantee. Similar to the Shafes' argument regarding the district court's interpretation of Taco Kid, this argument is misplaced. Upon de novo review, the version of the Guarantee used by the district court is irrelevant. See Ace, 414 F.3d at 899. We address, under our interpretation of the actual Guarantee, whether the district court properly found there was no genuine issue of material fact regarding the Shafes' intent to be personally bound.

Under Missouri law, a contract is interpreted with its plain and ordinary meaning, and will only be declared ambiguous if there is more than one reasonable interpretation of the contract. See Kelly v. State Farm Mut. Auto. Ins. Co., 218 S.W.3d 517, 522 (Mo. Ct. App. 2007). If there is no ambiguity, external evidence cannot be used to interpret the contract. Id.

The plain and ordinary meaning of the Guarantee evidences the Shafes' intent to be bound personally. In the signature block, the Shafes' did not sign the Guarantee with reference to their corporate capacities. This is distinctly different from the Shafes' other sets of signatures in the Credit Agreement and Dating Agreement which had the Shafes signing as either an "Authorized Signature" or on behalf of Cyrus as its "owner/President." The Shafes simply signed the Guarantee as "Principals" of Cyrus. See Taco Kid, 554 S.W.2d at 595–96. The Shafes did not designate their corporate capacity when signing the Guarantee, and we have not been presented with any evidence in this record to indicate the Shafes attempted to do so. See id. at 596 (finding personal liability on a guarantee even though the signatories, in their own handwriting, designated their capacities as president). Similarly, the Guarantee was a separate section of the Credit Agreement and contained the Shafes' fourth set of signatures in the Credit Agreement and Dating Agreement, which presumes the Shafes signed the Guarantee as a "simple but unequivocal act of manifesting" intent to be bound personally. Wired Music, 554 S.W.2d at 471.

The language of the Guarantee also supports interpreting the contract to bind the Shafes personally. The Guarantee states it was entered by the Shafes as a "principal" of Cyrus and "by reason of *their* interest" in Cyrus. (Emphasis added). The Guarantee notes the extension of credit to Cyrus may depend upon "his [Mr. Shafe's]/her [Ms. Shafe's] individual credit history." The use of these pronouns in the Guarantee section strongly suggests personal liability; if the language was being used to bind Cyrus, it is more likely the Guarantee would have used traditional entity references like "it" or "its."

Although the Shafes contend the Guarantee language contains errors which make its intent ambiguous, the grammatical errors the Shafes identify do not reflect upon their intent. Based upon the facts in this record surrounding the Guarantee, these errors are inaccuracies, not ambiguities. See Donovan v. Boeck, 116 S.W. 543, 547 (Mo. 1909) (reasoning, "[t]he language may be inaccurate, but if the court can determine the meaning of this inaccurate language without any other guide than a knowledge of the simple facts upon which, from the nature of language in general, its meaning depends, the language, though inaccurate, could not be ambiguous").

Finally, the structure of the Credit Agreement evinces the Guarantee's purpose to bind the Shafes personally. The Credit Agreement grants Cardinal a security interest in Cyrus in the event Cyrus fails to pay. If we were to interpret the Guarantee to bind Cyrus, the Guarantee would grant Cardinal a right it already possessed under its security interest and would have Cyrus guaranteeing its own debt. This interpretation would be "redundant, illusory, absurd, and therefore unreasonable." Taco Kid, 554 S.W.2d at 596 (citations and quotations omitted). Thus, the district court did not err in finding no genuine issue of material fact regarding the Shafes' personal liability under the Guarantee.

### 3. Consideration for Preexisting Debt

The Shafes ultimately contend, even if the Guarantee were signed in their personal capacity, the district court erred in granting summary judgment as to the Shafes' guarantee of all Cyrus's debt. The Shafes claim the lack of a date on the Guarantee, and the failure of the Guarantee, Credit Agreement, and Dating Agreement to reference each other, create fact questions regarding whether there was adequate consideration to enforce the Guarantee on Cyrus's $135,000 preexisting debt. The Shafes' argument is not convincing.

Under Missouri law, a guarantee is a contract which requires separate consideration. See Kurtz v. Fischer, 600 S.W.2d 642, 646 (Mo. Ct. App. 1980). "An agreement to extend the time for payment of an existing debt or a promise to forbear

collection, even for an indefinite time, is sufficient consideration for a guarantee of the debtor's obligation." Id. (citation omitted). "Where the contract of guaranty and the original contract creating the liability guaranteed are contemporaneously made, the two contracts are regarded as integrated and the consideration supporting the original contract also supports the guarantee." Id. (citation omitted).

Missouri courts have held a guarantee can be deemed contemporaneous with an original contract even if the guarantee is not made on the same day as the original contract. See Centennial State Bank v. S.E.K. Const. Co., Inc., 518 S.W.2d 143, 150 (Mo. Ct. App. 1974) (holding a guarantee was legally contemporaneous with a promissory note even though the guarantee was given ten days after the promissory note was entered). To be contemporaneous, Missouri courts tend to focus on whether the guarantee was part of an overall "single transaction" involving the original contract. See Edwards v. Heidelbaugh, 574 S.W.2d 25, 28 (Mo. Ct. App. 1978).

The Dating Agreement provides the consideration needed to tie the Guarantee to the $135,000 preexisting debt. Cyrus agreed under the Dating Agreement to make three payments of $45,000 to satisfy the debt. Cardinal's promise to allow Cyrus an additional six months to repay the existing debt was sufficient consideration for the Guarantee. See Kurtz, 600 S.W.2d at 646. The Guarantee was also made contemporaneously with the Dating Agreement. The Guarantee states it applies to all debt of Cyrus "now existing," and the Guarantee was made as part of the single transaction between Cardinal and Cyrus to renegotiate Cyrus's existing debt and continue their business relationship through a line of credit. See Edwards, 574 S.W.2d at 28. Thus, there is no genuine issue of material fact whether the Guarantee applies to Cyrus's preexisting debt through the Dating Agreement, and the district court did not err in granting summary judgment to Cardinal on the breach of guarantee claim.

### B. Award of Costs and Attorney Fees

Cyrus and the Shafes also challenge the district court's award of costs and attorney fees. "Factual determinations concerning an award of attorney's fees are

reviewed under a clearly erroneous standard, while the district court's determination of the amount of the fee award is reviewed for abuse of discretion. Interpretation of an unambiguous fee-shifting clause, however, is one of law to be reviewed de novo by this court." Litton Microwave Cooking Prod. v. Leviton Mfg. Co., Inc., 15 F.3d 790, 795 (8th Cir. 1994).

Cyrus and the Shafes first argue the district court was without jurisdiction to enter an award of costs and attorney fees because Cardinal's motion for costs and attorney fees was filed more than fourteen days after entry of final judgment on October 31, 2007, and thus was untimely under the fourteen day deadline of Fed. R. Civ. P. 54(d)(2)(B)(i). Cyrus and the Shafes incorrectly calculate entry of final judgment based upon the district court's order and docket entry of October 31, 2007.[4] Under Fed. R. Civ. P. 58(a), entry of judgment must be "set out in a separate document" before it is final. The district court fulfilled this requirement when the clerk entered final judgment on November 20, 2007. Cardinal filed its motion on December 4, 2007, which was within 14 days of entry of final judgment, and the district court had jurisdiction for its award.[5]

---

[4]The Shafes' attempt to liken this case to Reyher v. Champion Int. Corp., 975 F.2d 483 (8th Cir. 1992), is ineffective. In Reyher, id. at 486–87, a panel of this court held entry of final judgment was entered under Fed. R. Civ. P. 58 when a district court issued a separate document styled a "Judgment in a Civil Case" reporting a jury verdict and declaring "judgment is hereby entered." Based upon the record in this case, the district court's October 31, 2007 order and docket entry are not at all similar to Reyher.

[5]At oral argument, Cyrus and the Shafes presented, for the first time, an alternative argument that the district court lacked jurisdiction because it failed to keep the judgment open for amendment under Fed. R. App. P. 4 and Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130 (2d Cir. 2000). We choose not to consider this argument. See Stillmunkes v. Hy-Vee Employee Benefit Plan and Trust, 127 F.3d 767, 769-70 n.6 (8th Cir. 1997) ("We refuse to consider an argument presented to this court for the first time at oral argument.").

The Shafes next assert the Guarantee does not contain the attorney fees provision in the Credit Agreement. Under Missouri law, a party is not allowed attorney fees unless provided by contract, statute, or equity. See Moore v. Weeks, 85 S.W.3d 709, 723 (Mo. Ct. App. 2002). Section III of the Credit Agreement explicitly provides for Cardinal to recoup costs and attorney fees. Because the Guarantee also insures the Credit Agreement, the attorney fees provision of the Credit Agreement is incorporated by the Guarantee, and the Shafes are personally bound by the attorney fees provision. See Ulreich v. Kreutz, 876 S.W.2d 726, 730 (Mo. Ct. App. 1994) (determining a guarantee of a contract includes payment of attorney fees authorized by the contract).

Finally, Cyrus and the Shafes argue the district court's award of costs and attorney fees was an abuse of discretion. Cyrus and the Shafes assert Cardinal's attorney fees are outrageous and unreasonable because they are higher than the local rate, involved an excessive amount of hours and frivolous claims, and were expended on claims Cardinal ultimately voluntarily dismissed. The district court substantially reduced Cardinal's award of attorney fees to $65,000 from Cardinal's original request of $88,221.65. In this case, the amount of costs and attorney fees is not unreasonable to recover on a claim resulting in a $451,644.43 judgment. The district court did not abuse its discretion.

## III.  CONCLUSION

The district court's judgment is affirmed.

_____