# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-2008/08-2744

_____

| | | |
|---|---|---|
| Lee Borntrager; Donald P. Byers; James C. Chapman; Raymond D. Northrup; James L. Saddler; Thomas St. John; CRST Flatbed, Inc.; CRST Van Expedited, Inc., formerly known as CRST, Inc., | * * * * * * | |
| | * | Appeals from the United States |
| Appellants, | * | District Court for the |
| | * | Northern District of Iowa. |
| v. | * | |
| | * | |
| Central States Southeast and Southwest Areas Pension Fund, | * * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 12, 2009
Filed: August 21, 2009

_____

Before RILEY, SMITH, and COLLOTON, Circuit Judges.

_____

RILEY, Circuit Judge.

CRST Flatbed, Inc., CRST Van Expedited, Inc. (collectively, CRST), and six current and former employees of CRST (Participants), sued Central States, Southeast and Southwest Areas Pension Fund (Central States) after Central States expelled

CRST from the pension fund. The district court[1] granted summary judgment in favor of Central States, and awarded Central States attorney fees and litigation costs. CRST and the Participants appeal the district court's rulings regarding the grant of summary judgment and the award of attorney fees and litigation costs. We affirm.

## I.    BACKGROUND

Central States is a multiemployer employee benefit plan governed by a Trust Agreement and administered by ten Trustees, five of whom are selected by contributing employers and five of whom are selected by unions associated with the International Brotherhood of Teamsters. Central States is regulated by the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendment Act of 1980 (MPPAA), 29 U.S.C. §§ 1001-1461.

Under Central States's plan, actuaries created forty-one benefit classes which determine the fixed benefit amount a participating employee will receive from retirement until the end of his or her life. The benefit classes are based upon the cost estimates of the actuaries and assume the fund will receive contributions from younger employees to help pay the benefits of retired employees. If Central States does not receive contributions from younger employees, the actuarial assumptions may become financially unsound, and Central States may be unable to pay guaranteed benefits.

To guard against Central States becoming financially unsound, Article III § 1 of the Trust Agreement creates an "adverse selection" rule, which provides, in part,

> The Trustees are authorized to reject any collective bargaining agreement
> of an Employer (and all contributions from the Employer) whenever they
> determine either that the agreement is unlawful and/or inconsistent with

---

[1]The Honorable Jon Stuart Scoles, United States Magistrate Judge for the Northern District of Iowa, to whom the parties consented to the exercise of jurisdiction under 28 U.S.C. § 636(c).

any rule or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund (including but not limited to any arrangement in which the Employer is obligated to make contributions to the Trust Fund on behalf of some but not all of the Employer's bargaining unit employees, and any arrangement in which the Employer is obligated to make contributions to the Trust Fund at different contribution rates for different groups of the Employer's bargaining unit employees). Any such rejection by the Trustees of a collective bargaining agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in the termination of the Employer and all Employees of the Employer from further participation in the Fund on and after such effective date.

In 1990, Central States promulgated Special Bulletin 90-7, which expounded on the adverse selection rule. Special Bulletin 90-7 explained the adverse selection rule "protect[s] the financial soundness of" Central States by prohibiting employment practices which "restrict[] pension coverage to only those employees likely to receive a benefit and exclude[] those employees less likely to receive a benefit." The bulletin also provided a non-exhaustive list of three examples of adverse selection, including (1) unequal contribution on behalf of employees who perform the same type of work; (2) contribution for certain individuals rather than a group of employees, or the creation of a non-covered employee group; and (3) classification of full-time employees subject to contribution as casual, part-time, or temporary.

CRST contributed to Central States under a collective bargaining agreement with Chauffeurs, Teamsters and Helpers Local Union 238 (Local 238), and a separate collective bargaining agreement with Chauffeurs, Teamsters and Helpers Local Union 142 (Local 142). As a participating employer, CRST signed a Participation Agreement with Central States which bound CRST to the terms, rules, and regulations of the Trust Agreement.

In March 2002, Central States notified CRST that Central States was reviewing CRST's actions in relation to Local 238 and Local 142 for possible violations of the adverse selection rule. Central States's investigation of CRST revealed CRST's participating employees in Local 238 decreased from six employees in 1992 to two employees in 2002 with no new hires in the ten years before the investigation, and also found CRST admitted it outsourced work when Local 238 employees departed from CRST. Central States similarly found CRST's participating employees in Local 142 declined from seventeen in 1992 to seven in 2002 with no new hires since March 1989, and CRST admitted participation in Central States on behalf of Local 142 employees declined based upon decreased business and CRST's decision to replace departing Local 142 employees with independent contractors. Central States's Actuarial Services Department further determined the future benefit accruals of CRST employees covered by the collective bargaining agreements with Local 238 and Local 142 would exceed the contributions Central States would receive from CRST for these employees.

On August 21, 2002, Central States's Contracts Subcommittee recommended the Board of Trustees expel CRST from Central States. Based upon the recommendation and the findings of Central States's investigation and Actuarial Services Department, the Board of Trustees unanimously voted to expel CRST from Central States because (1) CRST's collective bargaining agreements violated Central States's rules and requirements of participation, and (2) CRST was "engaged in practices and arrangements that cause, and threaten to cause economic harm to, and impairment of the actuarial soundness of the Pension Fund." Central States terminated the participation of CRST and its Participants in Central States on September 29, 2002, and assessed complete withdrawal liability against CRST under ERISA.

## II.    PROCEDURAL HISTORY

On September 24, 2002, CRST and the Participants filed a complaint in the district court seeking declaratory and injunctive relief against Central States for wrongful expulsion of CRST.  CRST and the Participants amended the complaint to include the following five causes of action: (1) Central States wrongfully expelled CRST; (2) Central States's expulsion of CRST tortiously interfered with CRST's collective bargaining agreements with Local 238 and Local 142; (3) Central States violated ERISA, 29 U.S.C. § 1140, when Central States expelled CRST; (4) Central States, as a third party beneficiary to CRST's collective bargaining agreements with Local 238 and Local 142, breached the collective bargaining agreements and violated the Taft-Hartley Act by expelling CRST; and (5) Central States engaged in disparate treatment by failing to enforce equally the adverse selection rule against another participating employer, United Parcel Service (UPS).  CRST and the Participants based subject matter jurisdiction for their suit upon 29 U.S.C. § 1451.  The amended complaint asked the district court to (1) reinstate CRST into Central States; (2) require Central States to receive contributions from CRST; (3) grant CRST employees retroactive credits for service since the expulsion; (4) order reimbursement of the withdrawal liability assessed against, and paid by, CRST; and (5) award costs and attorney fees to CRST.

Central States moved to dismiss CRST's and the Participants' amended complaint for lack of subject matter jurisdiction and failure to state a claim under Fed. R. Civ. P. 12(b)(1) and (6).  The district court found subject matter jurisdiction was proper under 29 U.S.C. § 1451 and denied Central States's Rule 12(b)(1) motion, but granted Central States's Rule 12(b)(6) motion on counts two, three, four, and five of the amended complaint.

On July 2, 2003, CRST and the Participants filed a second amended complaint which added 29 U.S.C. § 1132(e), 28 U.S.C. § 1331, and federal common law as bases for jurisdiction.  Central States moved to dismiss the second amended complaint based

upon Fed. R. Civ. P. 12(b)(1) and (6), and the district court, for the same reasons provided on the first motion to dismiss, denied the motion.

While Central States's motions to dismiss were being litigated, CRST and the Participants moved the district court to compel discovery of documents outside the administrative record which pertained to Central States's application of the adverse selection rule to UPS. The district court denied the motion, and CRST moved the district court to remand the case to the Trustees for further development of the record regarding Central States's application of the adverse selection rule to UPS. The district court granted CRST's and the Participants' motion, remanded the case to the Trustees, and ordered Central States to allow CRST and the Participants discovery regarding Central States's treatment of UPS.

Central States appealed to this court the district court's remand order and the district court's denial of Central States's motion to dismiss for lack of jurisdiction. See Borntrager v. Cent. States, Se. and Sw. Areas Pension Fund, 425 F.3d 1087, 1090 (8th Cir. 2005). We dismissed Central States's appeal for lack of appellate jurisdiction, holding the district court's rulings were not final appealable orders or actions. See id. at 1090-93. In a footnote, we addressed the subject matter jurisdiction issue, stating,

> As our decision in [Cent. Hardware Co. v. Cent. States, Se. & Sw. Areas Pension Fund, 770 F.2d 106 (8th Cir. 1985),] makes clear, the contention there is *no* federal jurisdiction over CRST's wrongful expulsion claim is plainly without merit. Before enactment of ERISA in 1974, § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), conferred federal jurisdiction over claims alleging breach of a pension or welfare benefit trust agreement that was an integral part of a collective bargaining agreement. ERISA of course greatly expanded federal regulation of pension funds and granted federal courts broad jurisdiction over civil actions to interpret and enforce those plans. In Central Hardware, the district court accepted jurisdiction over a wrongful

expulsion claim under [29 U.S.C.] § 1132(e), and we reviewed the merits of that claim without discussing the jurisdiction issue.

In this case, the district court may have erred in assuming jurisdiction under 29 U.S.C. § 1451 if expulsion is not an "act" under Subtitle E [of ERISA], but that issue can be taken up on appeal from the final judgment. Moreover, if the expulsion was valid, the district court will need to decide whether such an expulsion triggers withdrawal liability under the MPPAA, an issue that may be subject to mandatory arbitration. Section 1451 clearly confers federal jurisdiction over CRST's claim for reimbursement of that statutory liability.

Id. at 1092 n.1 (citations omitted).

On remand, the Trustees affirmed their earlier decision to expel CRST, and CRST and the Participants filed a third amended complaint. The third amended complaint, which only alleged a claim for wrongful expulsion, added 29 U.S.C. § 185(a) as a basis for subject matter jurisdiction, and asked the district court to reimburse CRST's withdrawal liability payment and distribute the payment to the Participants pro rata rather than reinstating CRST into Central States. Central States moved to dismiss the third amended complaint, and the district court denied the motion.

On October 1, 2007, the parties filed cross motions for summary judgment. The district court denied CRST's and the Participants' motion, granted Central States's motion, and dismissed the third amended complaint. The district court found (1) Central States lawfully exercised its authority to expel CRST under Article III § 1 of the Trust Agreement; (2) Central States did not abuse its discretion or arbitrarily or capriciously expel CRST based upon CRST's employment practices or Central States's treatment of UPS; and (3) Central States did not act in bad faith or with an improper motive in expelling CRST.

After judgment was entered on Central States's motion for summary judgment, Central States moved the district court for attorney fees and litigation costs based upon Article III § 6 of the Trust Agreement, which provides,

> Whenever the Trustees exercise their authority to reject a collective bargaining agreement of an Employer and effect the termination of the Employer and all Employees of the Employer from further participation in the Fund on and after an effective date determined by the Trustees, and there is related litigation to which the Trustees (or any of the Trustees) and/or the Fund and the Employer are parties (regardless of which entity or entities commenced the litigation), the Trustees and the Fund, at the conclusion of the litigation by judgment or settlement (except by judgment that in effect invalidates the Trustees' rejection of the collective bargaining agreement), shall be entitled to recover from the Employer a payment in the amount of the attorney's fees and litigation costs incurred by the Trustees and/or the Fund in the course of the litigation.

CRST and the Participants argued Central States was not entitled to attorney fees under ERISA, 29 U.S.C. § 1132(g), but the district court granted Central States's motion under the Trust Agreement, and awarded Central States $79,229.95 in attorney fees and litigation costs. CRST and the Participants appeal the district court's summary judgment ruling and the district court's award of attorney fees and litigation costs.

## III.   DISCUSSION
### A.    Subject Matter Jurisdiction
As a preliminary matter, Central States argues the district court lacked subject matter jurisdiction on the bases alleged by CRST and the Participants in the third amended complaint. We have the right and duty to raise and determine the district court's subject matter jurisdiction at any time. See Arnold v. Wood, 238 F.3d 992, 994 (8th Cir. 2001) ("We are required to ascertain the existence of jurisdiction, whether subject-matter or appellate, at the outset of an appeal. We must resolve

outstanding questions of jurisdiction before proceeding to analyze the merits. It is our obligation to notice jurisdictional infirmities, whether the parties notice them or not." (citations omitted)). We review the district court's subject matter jurisdiction de novo. See Keene Corp. v. Cass, 908 F.2d 293, 296 (8th Cir. 1990).

In Borntrager, 425 F.3d at 1092 n.1, we stated 29 U.S.C. § 185 provides federal jurisdiction over the wrongful expulsion claim, and declared ERISA, specifically 29 U.S.C. § 1132, "greatly expanded" federal jurisdiction over interpretation and enforcement of pension funds. Id. We agree with the statement in Borntrager that the district court had jurisdiction over the wrongful expulsion claim under 29 U.S.C. § 185. See Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 366 n.2 (1984) ("Section 301(a) of the [Labor Management Relations Act, 29 U.S.C. § 185(a),] provides a federal forum for suits to enforce labor contracts, including pension and welfare fund agreements. Section 502 of ERISA [29 U.S.C. § 1132] also provides a federal forum for enforcement of the various duties imposed by such trust fund agreements.").

## B.    Motion for Summary Judgment

CRST and the Participants contend the district court erred in granting summary judgment to Central States because (1) Central States lacked the contractual authority to expel CRST, (2) CRST's expulsion was contrary to federal labor law and ERISA, and (3) CRST's expulsion was contrary to this court's precedent.

We review a district court's grant of summary judgment de novo. See Cardinal Health 110, Inc. v. Cyrus Pharm., LLC, 560 F.3d 894, 898 (8th Cir. 2009). "[V]iewing the facts in the light most favorable to the nonmoving party," summary judgment should be granted "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Franklin v. Local 2 of the Sheet Metal Workers Intern. Ass'n, 565 F.3d 508, 520 (2009) (internal marks and citation omitted).

### 1.    Central States's Expulsion Authority

CRST and the Participants first argue Central States did not have the contractual authority to expel CRST based upon the use of independent contractors and a decline in employee participation.  CRST and the Participants concede Central States can expel an employer for adverse selection in certain circumstances involving the employer's employees.  However, CRST and the Participants contend the collective bargaining agreements, the Participation Agreement, and the Trust Agreement do not allow Central States to expel CRST based upon alleged adverse selection involving the use of independent contractors because (1) the documents authorize CRST to use independent contractors who are barred by federal law to participate in Central States, and (2) under the doctrine of *ejusdem generis*, the language and examples of adverse selection in the Trust Agreement and Special Bulletin 90-7 limit expulsion based upon adverse selection to employment practices involving employees, not independent contractors.  CRST and the Participants contend Central States's expulsion of CRST was unlawful because CRST had enrolled all eligible employees in Central States, and CRST was not in violation of the collective bargaining agreements, Participation Agreement, or the Trust Agreement.

We review the terms of a contract de novo.  See Cardinal Health, 560 F.3d at 898 (citation omitted).  Central States's authority under the collective bargaining agreements, the Participation Agreement, and the Trust Agreement is "freely reviewable."[2] Cent. Hardware, 770 F.2d at 109 (internal marks and citations omitted).  However, Central States's "determination that the trust documents authorize their [actions] has significant weight, for the trust agreement explicitly provides that 'any

------

[2]CRST and the Participants have not challenged Central States's reasons for expelling CRST, which would be subject to arbitrary, capricious, and abuse of discretion review.  See Cent. Hardware, 770 F.2d at 109.  We choose not to address the issue.  See Anderson v. Larson, 327 F.3d 762, 771 (8th Cir. 2003) ("Our general rule is a party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue."  (internal marks and citations omitted)).

construction [of the agreement's provisions] adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers.'" Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 568 (1985); see also Cent. Hardware, 770 F.2d at 110.

Central States did have the contractual authority to expel CRST. Article III § 1 of the Trust Agreement allows Central States "to reject any collective bargaining agreement . . . [when] the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund." This language does not limit Central States's authority to certain forms of employment practices. Central States only has to find an employer is engaged in "one or more" employment practices which may threaten the financial or actuarial viability of the fund. Once Central States makes such a determination, it is authorized to act. See Cent. Hardware, 770 F.2d at 110 (concluding "the trust agreement gives [Central States] authority to reject payments from participating employers which threaten [Central States's] actuarial soundness"); see also Cent. Transp., 472 U.S. at 570-71 (stating Central States has "all such powers as are necessary or appropriate for the carrying out of the purposes of the trust," including the authority to fulfill fiduciary duties to protect plan beneficiaries (internal marks and citations omitted)).

The examples provided in Article III § 1 and Special Bulletin 90-7 do not limit Central States's authority, because the examples are not all-encompassing. The example in Article III § 1 is preceded by "included but not limited to," and Special Bulletin 90-7 states the list of examples is "not exhaustive" and "not intended to be an all inclusive list of unacceptable arrangements." Special Bulletin 90-7 further disclaims that "[a]ny collective bargaining arrangement that encourages adverse selection is subject to rejection by the Board of Trustees." The examples, thus, did not limit Central States's authority to expel an employer if the employer uses an employment practice which threatens to harm or impair the fund.

-11-

CRST's legal right to use independent contractors also does not affect Central States's authority to expel CRST under the adverse selection rule. Central States did not expel CRST because CRST was using independent contractors. There is no evidence in the record indicating Central States was attempting to prohibit CRST's use of independent contractors or require contributions on behalf of independent contractors. Central States expelled CRST because CRST had an actuarially adverse employment group when CRST shifted work to independent contractors rather than hiring new employees. Central States's determination that this transfer of work was adverse to the fund was permissible under Article III § 1.

Similarly, CRST's compliance with the collective bargaining agreements does not impair Central States's expulsion authority. The bargaining agreements do not override the authority granted Central States in Article III § 1 of the Trust Agreement. See Cent. Hardware, 770 F.2d at 108, 110 (holding Central States had authority under the Trust Agreement to expel an employer even though the employer had tendered payments to Central States in compliance with a collective bargaining agreement); see also Schneider Moving & Storage, 466 U.S. at 373-74 (explaining Central States was not bound by an arbitration provision found in collective bargaining agreements).

Given the broad language of Article III § 1 of the Trust Agreement and the significant weight afforded Central States's determination that it had the authority to expel CRST, we are convinced Central States did have the authority to expel CRST. See Cent. Hardware, 770 F.2d at 110.

### 2. Contravention of Federal Labor Law

CRST and the Participants next argue Central States's expulsion of CRST was unlawful because the expulsion was contrary to federal labor law. CRST and the Participants contend, if the expulsion was based upon CRST's use of independent contractors, Central States's expulsion of CRST contravened the Labor Management Relations Act (LMRA) because LMRA prohibits independent contractors from

participating in the fund. CRST and the Participants also assert Central States's expulsion was contrary to MPPAA because Congress established withdrawal liability as a fund's specific remedy for declining employee participation. CRST and the Participants maintain Central States's expulsion of CRST was not authorized by, and outside of, the MPPAA withdrawal provisions because (1) the expulsion created an unauthorized complete withdrawal which substituted Central States's judgment for Congress's, and (2) CRST's transfer of work to independent contractors did not trigger MPPAA partial withdrawal liability.

On de novo review, see WWC License, L.L.C. v. Boyle, 459 F.3d 880, 890 (8th Cir. 2006), CRST's and the Participants' LMRA arguments are not persuasive. As discussed earlier, Central States did not expel CRST based upon CRST's use of independent contractors, but instead expelled CRST for maintaining an actuarially adverse employee group by failing to hire new employees and shifting work to independent contractors when employees departed. Thus, Central States's expulsion of CRST was not based upon an improper or unlawful reason, and did not constitute a violation of LMRA.

CRST's and the Participants' argument regarding MPPAA is equally unpersuasive. In Cent. Hardware, 770 F.2d at 108, 110, we held Central States had authority under the Trust Agreement to expel an employer when the employer's bargaining unit decreased. Further CRST's and the Participants' brief concedes Central States has authority to expel an employer under Article III § 1 of the Trust Agreement, and CRST and the Participants cite no provision of ERISA or MPPAA which explicitly constrains Central States's Trust Agreement authority. Given our holding in Cent. Hardware, and CRST's and the Participants' concession, CRST and the Participants cannot now argue the MPPAA withdrawal provisions limit Central States's expulsion authority. The expulsion of CRST did not contradict federal labor law. See Cent. Transp., 472 U.S. at 570-71 (stating Congress did not enumerate every power of pension fund trustees in ERISA, but instead outlined trustees' powers based

-13-

upon the trustees' common law fiduciary duties and the general premise that trustees "have all such powers as are necessary or appropriate for the carrying out of the purposes of the trust" (internal marks and citations omitted)).

### 3. Violation of Eighth Circuit Precedent

CRST and the Participants also argue Central States's expulsion violated our opinion in <u>Cent. States, Se. and Sw. Areas Pension Fund v. CRST, Inc.</u>, 641 F.2d 616 (8th Cir. 1981). CRST and the Participants contend <u>CRST, Inc.</u> adjudicated the contractual authority of Central States under ERISA and limited the authority to situations involving employees and plan participants. CRST's and the Participants' argument creates a legal question which we review de novo. <u>See</u> <u>Sheehan v. Guardian Life Ins. Co.</u>, 372 F.3d 962, 966 (8th Cir. 2004).

In <u>CRST, Inc.</u>, 641 F.2d at 617, we addressed "whether CRST is required to make available to [Central States] for audit purposes the employment and earnings records of *all* CRST employees including employees who may not be covered by a collective bargaining agreement requiring contributions to the Funds on their behalf." To address the issue, we analyzed Central States's audit authority under the contractual documents and ERISA. <u>Id.</u> at 618. We held Central States's audit authority was limited to information of employees covered by a collective bargaining agreement because (1) the audit provision was limited to "employees," (2) the definition of employees only encompassed employees covered by a collective bargaining agreement, and (3) ERISA limited Central States's audit right to its contractual authority.[3] <u>Id.</u> at 618-19.

---

[3]A portion of <u>CRST, Inc.</u> not relevant to this appeal was overruled by <u>Robbins v. Prosser's Moving and Storage Co.</u>, 700 F.2d 433, 443 (8th Cir. 1983) (en banc), and <u>CRST, Inc.</u>'s holding that Central States's audit authority is limited to the language of the Trust Agreement covering "employees" was contradicted by <u>Cent. Transp.</u>, 472 U.S. at 563, 581 (holding Central States has authority to audit employment records of employees whom the employer claims are not plan participants).

CRST, Inc. did not limit Central States's contractual expulsion authority to only situations involving employees. First, CRST, Inc. involved a provision expressly limited to covered "employees." CRST and the Participants cite the following statement for support of their argument: "fiduciary obligations mandated by ERISA are owed only to participants and beneficiaries . . . who may become eligible to receive a benefit from an employee benefit plan . . . [and not] [n]on-covered employees" Id. at 619. This statement, however, did not limit Central States's contractual abilities under the Trust Agreement. The statement instead cited 29 U.S.C. § 1104 and outlined the broad fiduciary duties of pension fund trustees under ERISA to protect the fund. See Cent. Transp., 472 U.S. at 570-71 (citing 29 U.S.C. § 1104 when discussing the powers and fiduciary duties of pension plan trustees to carry out the purposes of the trust).

The statement also supports our finding that Central States's expulsion authority is not limited to situations involving employees. Article III § 1 authorizes Central States to expel an employer to protect the financial and actuarial viability of the fund. When Central States finds a particular employment practice may threaten to or actually does harm the fund, Central States's authority to expel an employer allows Central States to fulfill its fiduciary obligations to plan beneficiaries and participants to maintain a fund which will be able to pay guaranteed benefits. CRST, Inc. thus did not limit Central States's expulsion authority, and Central States's expulsion of CRST did not violate our precedent. The district court did not err in granting Central States's motion for summary judgment.[4]

_____

[4]Central States also argues summary judgment was proper because CRST and the Participants requested relief which could not be granted. Because we affirm the district court's grant of summary judgment based upon the Trust Agreement, we do not address Central States's additional argument.

### C. Attorney Fees and Litigation Costs

CRST finally argues the district court erred in awarding attorney fees and litigation costs because (1) the district court was required to award attorney fees and litigation costs, if at all, under 29 U.S.C. § 1132 instead of under Article III § 6 of the Trust Agreement, and (2) the Trust Agreement was a contract of adhesion.

### 1. Preemption and 29 U.S.C. § 1132(g)(1)

CRST first claims the district court's award of attorney fees and litigation costs to Central States was erroneous because the district court did not use 29 U.S.C. § 1132(g)(1), and its corresponding five factor test, which CRST asserts preempted Article III § 6 of the Trust Agreement.

Central States responds CRST failed to argue in the district court why 29 U.S.C. § 1132(g)(1) applies to this case, and has thus waived the argument. Although CRST did not memorialize the exact arguments it makes on appeal in its resistance to Central States's motion for attorney fees, CRST did argue the application of 29 U.S.C. § 1132(g)(1) and its five factor test in the district court. The district court's order recognized CRST's attempt to apply 29 U.S.C. § 1132(g)(1). CRST thus sufficiently raised the issue of the applicability of 29 U.S.C. § 1132(g)(1) in the district court. See Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1314 (8th Cir. 1991) (explaining whether an issue has been waived for appeal is not determined by a new argument raised on appeal, but instead whether the new argument raises a new issue on appeal). Further, whether Article III § 6 is preempted by ERISA is a purely legal question which does not require additional evidence or argument, and which we can review de novo for the first time on appeal. See Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002); Sheehan, 372 F.3d at 966.

Under the American Rule, a successful litigant is not entitled to attorney fees unless attorney fees are authorized by statute or allocated in an enforceable contract. See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co., 549 U.S. 443, 448

(2007). Under 29 U.S.C. § 1132(g)(1), a district court may, in its discretion, award attorney fees "[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary." 29 U.S.C. § 1144(a) provides, "[ERISA subchapters I and III] shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."

CRST contends, under 29 U.S.C. § 1144(a), Article III § 6 of the Trust Agreement was preempted by 29 U.S.C. § 1132(g)(1). CRST also asserts 29 U.S.C. § 1132(g)(1) provides a specific remedy fashioned by Congress which could not be altered by the Trust Agreement in this case. We disagree.

The language of 29 U.S.C. § 1132(g)(1) authorizes a district court to award attorney fees in an action brought by "*a participant, beneficiary, or fiduciary.*" (emphasis added). Based upon the plain language of the statute, 29 U.S.C. § 1132(g)(1) does not apply to employers, and does not preempt a contractual provision which allows attorney fees against an employer in litigation involving expulsion of the employer from a pension fund. Cf. 29 U.S.C. § 1132(g)(2)(D) (requiring an award of attorney fees to a pension plan in an action brought by the plan against an employer for delinquent payments). In this case, the district court awarded attorney fees against CRST, the employer. Article III § 6 authorized this award. The district court did not err in awarding attorney fees to Central States under the Trust Agreement.[5]

---

[5]CRST, conceding CRST is not entitled to sue under § 1132(a), notes the Participants were also plaintiffs in this action. If the district court would have awarded attorney fees and litigation costs against the Participants, our analysis would involve the Participants. Because that is not the situation in this case, we make no determination on that issue.

### 2.    Contract of Adhesion

CRST also asks this court to render the attorney fees provision in Article III § 6 unenforceable as a contract of adhesion.  CRST claims Article III § 6 is "unilateral, one-sided and unenforceable" because (1) CRST is not a party to the Trust Agreement; (2) CRST does not have a right to review or accept modifications or amendments to the Trust Agreement; (3) CRST does not know when Article III § 6 was adopted; (4) CRST did not have bargaining ability over Article III § 6; and (5) Article III § 6 deters employers and employee beneficiaries from bringing a lawful action under ERISA to challenge expulsion of an employer.

CRST failed to raise this argument in the district court.  Unlike CRST's preemption argument, this argument involves factual contentions which may be impacted by additional evidence or argument.  See Universal Title, 942 F.2d at 1314-15.  We will thus review CRST's argument for plain error and will reverse the district court "only to prevent a miscarriage of justice."  Cole v. Intern. Union, United Auto., Aerospace & Agric. Implement Workers of Am., 533 F.3d 932, 936 (8th Cir. 2008) (citation omitted).

Under Article XIV § 7, the Trust Agreement is governed and controlled by Illinois law.  Under Illinois law, "[a]n adhesion contract is generally a form agreement submitted to a party for acceptance without any opportunity to negotiate terms."  Endsley v. City of Chicago, 745 N.E.2d 708, 717 (Ill. App. Ct. 2001) (citation omitted).  "[C]ontracts of adhesion are generally lawful, and mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations."  Abbot v. Amoco Oil Co., 619 N.E.2d 789, 794-95 (Ill. App. Ct. 1993) (internal marks and citations omitted).

Article III § 6 of the Trust Agreement is not an unenforceable contract of adhesion.  There is no evidence in the record that CRST had no bargaining power or no right to review or accept plan amendments or modifications.  Five of the ten

Trustees of Central States are selected by participating employers. Similarly, there is no evidence to suggest CRST did not voluntarily enter into the Participation Agreement or the collective bargaining agreement with Local 238, which established CRST's intent to be bound by the Trust Agreement's terms, rules, and regulations. There is also no evidence in the record that Article III § 6 has a deterrent effect. Article III § 6 does not apply to employee participants, and only allows Central States to recover attorney fees and litigation costs from an employer when Central States's expulsion remains effective by judgment or settlement. On this record, Article III § 6 is not an illegal adhesion contract, and the district court did not err in awarding Central States attorney fees and litigation costs.

## IV. CONCLUSION

The district court's judgment is affirmed.

_____