770 F.2d 106
 120 L.R.R.M. (BNA) 3029, 121 L.R.R.M. (BNA) 2284,
103 Lab.Cas. P 11,637,
1985-2 Trade Cases 66,739,
6 Employee Benefits Ca 2525
 CENTRAL HARDWARE COMPANY, a corporation, Appellee,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Loran W. Robbins, Marion M. Winstead, Harold J. Yates,
Earl L. Jennings Jr., Howard McDougall, Robert J. Baker,
Arthur H. Bunte Jr., and R.V. Pulliam Sr., as Trustees of
the Central States, Southeast and Southwest Areas Pension
Fund, and George W. Lehr, Executive Director of the Central
States, Southeast and Southwest Areas Pension Fund, Appellants.
CENTRAL HARDWARE COMPANY, a corporation, Appellant,
v.
CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND,
and Loran W. Robbins, Marion M. Winstead, Harold J. Yates,
Earl L. Jennings Jr., Howard McDougall, Robert J. Baker,
Arthur H. Bunte Jr., and R.V. Pulliam Sr., as Trustees of
the Central States, Southeast and Southwest Areas Pension
Fund, and George W. Lehr, Executive Director of the Central
States, Southeast and Southwest Areas Pension Fund, Appellees.
 Nos. 84-2158, 84-2297.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 8, 1985.
Decided Aug. 8, 1985.
 
 Jim J. Shoemake, St. Louis, Mo., for Central States, Southeast and Southwest Areas Pension Fund et al.
 Lynn Chipperfield, St. Louis, for Central Hardware Co.
 Before BRIGHT, ARNOLD and FAGG, Circuit Judges.
 FAGG, Circuit Judge.
 
 
 1
 Central Hardware Company (CH) brought suit against Central States, Southeast and Southwest Areas Pension Fund (CS) and its trustees and executive director for refusing to accept payments tendered by CH. CH claims CS' actions amount to: (1) a breach of the trust agreement between the parties, (2) intentional interference with CH's collective bargaining agreement with St. Louis Teamsters Local Union No. 688 (Union), and (3) a violation of federal antitrust laws.
 
 
 2
 The district court agreed that CS' refusal to accept the payments tendered by CH amounts to a breach of the parties' trust agreement and thus enjoined CS from refusing to accept payments in the future. The court rejected CH's claims for tortious interference with its collective bargaining agreement and violations of the antitrust laws. Both parties have appealed from the rulings of the district court that operate in their disfavor. 595 F.Supp. 414 (E.D.Mo.1984).
 
 
 3
 We reverse the district court's ruling on CH's breach of the trust agreement claim and affirm the district court's rejection of CH's tortious interference and antitrust claims.
 
 Facts
 
 4
 CS is a large, multi-employer pension fund governed by section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 186(c)(5), and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1001 et seq., as amended by the Multi-Employer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. Sec. 1322a et seq. CS operates as a trust, providing pension and other benefits to employees covered under collective bargaining agreements negotiated by various affiliates of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.
 
 
 5
 CH, a St. Louis based corporation, engages in collective bargaining with Local Union 688. In compliance with its collective bargaining agreement with the Union, CH makes payments to CS for the purpose of providing benefits to its employees.
 
 
 6
 CH has been a participating employer in CS since 1959. At the commencement of negotiations for its 1979-82 collective bargaining agreement with the Union, CH demanded the termination of payments to CS and proposed, instead, to make payments for the benefit of those represented by the Union into an alternative pension plan. The Union rejected CH's demand and CH continued to make payments to CS.
 
 
 7
 Within a year CH reopened negotiations with the Union and again discussed termination of payments to CS. CH and the Union entered into a mid-term memorandum of understanding in which the Union agreed to discuss in the 1982-85 collective bargaining negotiations the making of payments by CH for all or any portion of its bargaining unit into the Teamsters Negotiated Occidental Pension Plan (TNOPP) rather than to CS.
 
 
 8
 Following execution of the memorandum of understanding, Congress enacted the Multi-Employer Pension Plan Amendments Act of 1980, 29 U.S.C. Sec. 1322a et seq. Under the MPPAA, Congress imposed liability for unfunded vested benefits on employers that withdraw from a multi-employer pension plan. Consequently, in the 1982 collective bargaining negotiations CH did not seek a total termination of payments to CS. Rather, believing it would avoid MPPAA withdrawal liability, CH agreed to continue making payments to CS on behalf of all but the newly hired Union employees. For those hired after May 19, 1982, CH demanded that it make payments to the TNOPP.
 
 
 9
 The Union yielded to CH's demands and agreed that payments by CH on behalf of all newly hired employees be made to the TNOPP rather than to CS. The Union did, however, demand the execution of a memorandum of understanding providing for the possibility of the new collective bargaining agreement violating the terms and provisions of "the Central States Pension Plan in existence and effect on May 19, 1982." The memorandum provided that in the event of a judicial determination that the new agreement violates the terms of CS' plan, CH agrees that contributions for newly hired employees will be made to CS rather than to the TNOPP.
 
 
 10
 This controversy results from CS' response to the 1982 collective bargaining agreement between CH and the Union. After reviewing the 1982 agreement, CS concluded that the absence of payments by CH on behalf of employees hired after May 19, 1982, would operate to threaten CS' actuarial soundness. By resolution of its Board of Trustees, CS thus informed CH and the Union that unless CH made payments to CS on behalf of both old and new hirees, it would terminate the bargaining unit's participation in the trust fund. CH declined to alter its agreement with the Union and CS in turn refused acceptance of payments tendered by CH for employees hired prior to the May 19, 1982 cut-off date.
 
 Breach of Trust Agreement
 
 11
 The documents governing the contractual relationship between CS and CH include the CS trust agreement and the resulting CS pension plan, along with the collective bargaining agreement and participation agreement signed by CH and the Union. CH contends that CS is obligated under various provisions of these governing documents to accept the payments tendered by CH on behalf of employees hired prior to May 19, 1982. CS points to other provisions in the relevant documents to support its authority to refuse acceptance of the tendered payments. The parties do not dispute that both the powers and obligations of the trustees are to a large degree determined by the provisions of the trust documents. See Sinai Hospital of Baltimore, Inc. v. National Benefit Fund for Hospital & Health Care Employees, 697 F.2d 562, 567 (4th Cir.1982). Rather, their dispute is over the legal construction to be applied to various document provisions.
 
 
 12
 The district court agreed with CH, concluding not only that there is no authority in the documents for CS' refusal to accept CH's tendered payments but that the trust agreement requires CS to accept the payments tendered by CH under its collective bargaining agreement with the Union. The district court thus enjoined CS from refusing to accept the payments tendered by CH for the benefit of employees hired prior to May 19, 1982.
 
 A. Standard of Review
 
 13
 Initially, we must decide whether the pertinent documents governing the contractual relationship between CS and CH provide the trustees with authority to reject the payments tendered by CH. A construction of the trustees' authority under the terms of these documents "raise[s] issues of law and [is] freely reviewable." Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 698 F.2d 802, 805 (6th Cir.1983), rev'd on other grounds, --- U.S. ----, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985); see International Union, United Automobile Workers of America v. General Electric Co., 714 F.2d 830, 832 (8th Cir.1983); Western Contracting Corp. v. Dow Chemical Co., 664 F.2d 1097, 1100 (8th Cir.1981). Once it is determined that the trustees have the authority to reject payments under the terms of the relevant documents, our review of the propriety of their actions in rejecting the payments is limited to a determination of whether the trustees' decision is arbitrary, capricious, or an abuse of discretion. Torimino v. United Food and Commercial Workers International Union, Industry Pension Fund, 712 F.2d 882, 883 (8th Cir.1983); Quinn v. Burlington Northern, Inc. Pension Plan, 664 F.2d 675, 678 (8th Cir.1981), cert. denied, 456 U.S. 928, 102 S.Ct. 1976, 72 L.Ed.2d 444 (1982).
 
 B. Provisions of the Governing Documents
 
 14
 CH supports its argument that CS is obligated to accept the payments tendered by initially pointing to its obligation under Article III, section 1 of the trust agreement to "make continuing and prompt payments to the Trust Fund as required by the applicable collective bargaining agreement between the parties." Section 7.01 of the pension plan provides essentially the same thing. CH notes that its 1982 collective bargaining agreement with the Union obligates it to make payments only for the benefit of those employees hired prior to May 19, 1982. CH then points to Article III, section 3 of the trust agreement in which the trustees "agree to receive all such payments, deposits, moneys, insurance and annuity contracts" made by the employers to CS. CH also relies on Article IV, section 2 of the trust agreement which obligates the trustees to collect the income from and contributions to the trust fund. CH argues that these provisions obligate CS to receive the payments tendered by CH, and further that no other provisions of the relevant documents give CS the authority to reject the tendered payments.
 
 
 15
 If the sections CH is relying on were the only provisions in the trust agreement relevant to the powers and duties of the trustees, we might be inclined to agree with CH. Our review of the documents, however, reveals a number of provisions highly supportive of the trustees' authority to refuse the tender of payments made by CH.
 
 
 16
 Article IV of the trust agreement contains several pertinent provisions respecting the powers and duties of CS' trustees. Section 1 of Article IV gives the trustees the "authority to control and manage the operation and administration of the Trust in accordance with applicable law." Section 2 provides that "[t]he Trustees shall hold, manage, care for and protect the Trust Fund * * *." (Emphasis added.) Section 9 permits the trustees "to formulate and promulgate any and all necessary rules and regulations which they deem necessary or desirable to facilitate the proper administration of the Trust." Section 9 further provides that "[a]ll rules and regulations adopted by action of the Trustees for the administration of the Trust Fund shall be binding upon all parties hereto [and] all parties dealing with the Trust." Section 14(e) permits the trustees "[t]o do all acts, whether or not expressly authorized herein, which the Trustees may deem necessary or proper for the protection of the property held hereunder." (Emphasis added.) Finally, section 17 of the trust agreement provides that "[t]he Trustees, by majority action, shall have the power to construe the provisions of this agreement and the terms and regulations of the Pension Plan; and any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers." (Emphasis added.)
 
 
 17
 Further, section 6.02 of CS' pension plan provides that "[a]ll rules and regulations adopted by the Trustees and all decisions made by the Trustees shall be binding upon all parties to the Trust Agreement." (Emphasis added.) Finally, section 32.04 of the collective bargaining agreement and paragraph 7 of the participation agreement bind CH and the Union to all rules and regulations adopted by the trustees and all actions taken by the trustees in the administration of the trust.
 
 
 18
 CS maintains that the above quoted sections obligate it to care for and protect the trust fund and further give it the power to carry out this obligation. It is CS' position that allowing CH to make payments to the fund only on behalf of employees hired prior to May 19, 1982, would seriously threaten the actuarial soundness of the fund. CS notes that it is a "universal actuarial assumption * * * that the contributions of new members who replace retiring members will be used in part to pay the benefits due retired members * * *. Thus, if no new members enter the group, benefit funds will run out before all the benefits due to retirees based on their life expectancies are paid off." Therefore, in order to protect the fund and fulfill its obligations to the participants and beneficiaries, CS has refused to accept payments tendered by CH.
 
 
 19
 We agree with the contention of CS that the trust agreement gives it authority to reject payments from participating employers which threaten its actuarial soundness. CH has agreed to be bound by all decisions of the trustees. In an effort to carry out their obligation to protect the trust fund and assure a continuation of benefit payments, the trustees have decided to reject the tendered payments. The trustees' determination that they have the authority to so act is not only supportable by a construction of the governing documents but is entitled to significant weight. See Central States, Southeast and Southwest Areas Pension Fund, --- U.S. at ----, 105 S.Ct. at 2839. As provided in the trust agreement, "any construction [of the trust agreement] adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employer." We have no evidence that the trustees have acted other than in the utmost good faith.
 
 C. Review of Trustees' Actions
 
 20
 Having determined that the trustees had the authority to refuse the payments tendered by CH in order to protect the fund, we must determine whether their actions in doing so were "arbitrary, capricious, or an abuse of discretion." Torimino, 712 F.2d at 883. We conclude that the trustees acted reasonably under the circumstances.
 
 
 21
 CS maintains that permitting the type of action taken by CH would operate to threaten the actuarial soundness of CS. The evidence is uncontradicted that the absence of payments by employers on behalf of new hirees would expose CS to a substantial unfunded benefit liability. As previously noted, it is a universal actuarial assumption that the contributions of new members who replace retiring members will be used in part to pay the benefits due retired members.
 
 
 22
 With CH's actions operating to threaten the actuarial soundness of CS, and with the actuarial soundness of CS being "essential to its ability to pay benefits to participants and their beneficiaries," Talarico v. United Furniture Workers Pension Fund, 479 F.Supp. 1072, 1081 (D.Neb.1979), it was reasonable for CS to reject the payments tendered by CH. See generally Central States, Southeast and Southwest Areas Pension Fund v. Chicago-St. Louis Transport Co., 535 F.Supp. 476, 481 (N.D.Ill.1982), aff'd 720 F.2d 681 (7th Cir.1983). Additionally, we note that CS' rejection of CH's tendered payments is consistent with its policy of rejecting actions that threaten its actuarial soundness, see Special Bulletin # 20, D.R. at 81, and with its obligation under ERISA to act solely in the interest of and for the exclusive purpose of providing benefits to the participants and beneficiaries, 29 U.S.C. Sec. 1104(a)(1)(A)(i).
 
 
 23
 As a final note on CH's trust agreement claim, we point out that our holding is in no way meant to imply that CS has the authority to alter, reject, or rewrite the terms of the collective bargaining agreement between CH and the Union. We are holding that CS is given the authority in the governing documents to reject payments by participating employers that operate to threaten the actuarial soundness of the fund. CH has agreed that in the event of an unfavorable judicial determination, it will make retroactive payments with interest and future payments to CS on behalf of both old and new hirees. In turn, CS has agreed not to precipitate a termination of the bargaining unit from the trust fund.
 
 
 24
 Tortious Interference With Contractual Relations and Antitrust Claims
 
 
 25
 CH claims that CS, by refusing to accept the payments CH was obligated to tender under its collective bargaining agreement with the Union, tortiously interfered with CH's collective bargaining agreement with the Union. Under applicable Missouri law, the elements of a cause of action for tortious interference with contractual relations include:
 
 
 26
 (1) A contract or a business relationship;
 
 
 27
 (2) Knowledge by the third party of that contract or business relation;
 
 
 28
 (3) Intentional conduct by the third party inducing or causing the breach of the contract or interruption of the business relation;
 
 
 29
 (4) Absence of justification for the conduct of the third party; and
 
 
 30
 (5) Resulting damages.
 
 
 31
 Teale v. American Manufacturers Mutual Insurance Co., 687 S.W.2d 218, 219 (Mo.Ct.App.1984) (citing Francisco v. Kansas City Star Co., 629 S.W.2d 524 (Mo.Ct.App.1981)).
 
 
 32
 The district court determined that CH failed to sustain its burden of proving the absence of justification for CS' actions. It thus denied CH recovery on its claim for tortious interference. Having previously determined that CS had the authority to reject CH's tendered payments and that its decision to do so was reasonable under the circumstances, we agree that CH has failed to prove an absence of justification for CS' actions.
 
 
 33
 CH also claims that CS is engaged in an illegal tie-in arrangement in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. Sec. 1, by "attempting to 'tie' together the purchase of pension benefits for present employees with the purchase of pension benefits for future employees." CH further maintains that CS has "acquired and seek[s] to maintain a monopoly on pension contributions from the Fund's contributing employers" in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. Sec. 2. The district court rejected CH's claims for antitrust violations and we, too, find them lacking in merit.
 
 
 34
 We reverse the district court's decision enjoining CS from refusing to accept payments tendered by CH on behalf of employees hired prior to May 19, 1982. We affirm the district court's decision rejecting CH's claims for tortious interference with contractual relations and violations of the antitrust laws.