In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 25-1738 & 25-1872

PENSKE TRUCK LEASING, LP,

*Plaintiff-Appellant/Cross-Appellee,*

*v.*

CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION
PLAN and TRUSTEES OF CENTRAL STATES, SOUTHEAST AND
SOUTHWEST AREAS PENSION FUND,

*Defendants-Appellees/Cross-Appellants.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-05518 — **Andrea R. Wood**, *Judge.*

———————————

ARGUED DECEMBER 9, 2025 — DECIDED MAY 29, 2026

———————————

Before HAMILTON, ST. EVE, and PRYOR, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Multiemployer pension plans
depend on employers making regular contributions to a
single fund. When an employer stops making contributions
and withdraws from a plan, it is assessed withdrawal liability,
which can be expensive. An employer has an incentive to

minimize its total bill, while the plan has an incentive to maximize the amount owed.

This case arises from such a dispute between an employer, plaintiff Penske Truck Leasing, L.P., and a multiemployer plan, defendant Central States, Southeast and Southwest Areas Pension Plan, which believed Penske was trying to manipulate its bill for withdrawal liability. During negotiations, Central States threatened to expel one union of Penske employees, Local No. 745, from the plan. Penske sued Central States and its trustees to enjoin the union's termination and moved for a temporary restraining order (TRO), arguing that Central States had no authority to expel Local 745. Though the TRO was granted, the district court vacated it some months later. Central States counterclaimed, seeking a declaration establishing Local 745's withdrawal date, a fact crucial for calculating withdrawal liability.

These appeals arise from events later in the litigation. On summary judgment, the district court held that Central States had the authority to expel Local 745 and did not do so arbitrarily or capriciously. Penske challenges those conclusions. Citing 29 U.S.C. § 1401, the district court dismissed Central States' counterclaim, explaining that the substance of the counterclaim must be arbitrated before it can proceed in federal court. Central States challenges that dismissal. We affirm across the board.

Part I of this opinion introduces a few basics of withdrawal liability and then lays out the relevant facts and procedural history. Part II concludes that Central States had the authority to expel Local 745. Part III explains why the undisputed facts show that Central States' decision to expel Local 745 was not arbitrary or capricious. Part IV affirms the

dismissal of Central States' counterclaim because the dispute has not yet been submitted to arbitration as required by § 1401.

I.  *Factual Background and Procedural History*

   A.  *Withdrawal Liability*

In a multiemployer pension plan, employers make contributions that are pooled in a single fund, which is then used to pay benefits for the employees covered by the plan. 29 U.S.C. § 1002(37)(A); *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 605–07 (1993). Under this arrangement, an employee may change employers without losing the ability to accumulate pension credit. *Concrete Pipe*, 508 U.S. at 605–07. These multiemployer plans work particularly well in industries that rely on short-term or seasonal workers, such as construction and trucking. *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347 (7th Cir. 2012). Workers in those industries often spend their careers moving between employers. Multiemployer pension plans can ensure that their benefits move with them. *Id.*; accord, *Concrete Pipe*, 508 U.S. at 606.

"When a company withdraws, the plan remains financially liable to the employees with vested pension rights. Yet the plan 'no longer can look to the employer to contribute additional funds to cover these obligations.'" *Supervalu, Inc. v. United Food & Commercial Workers Unions & Employers Midwest Pension Fund*, 155 F.4th 913, 916 (7th Cir. 2025), quoting *Chicago Truck Drivers*, 698 F.3d at 347. Before the passage of the Multiemployer Pension Plan Amendments Act of 1980

(MPPAA), Pub. L. No. 96-364, 94 Stat. 1208, codified at 29 U.S.C. §§ 1381–1461, one employer's departure could trigger a plan's demise. To make up for the shortfall, the plan would raise costs for everyone else. *Supervalu*, 155 F.4th at 916. The higher the costs, the more employers would seek to withdraw, setting up a kind of death spiral. *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416–17 (1995). In the worst case, a plan facing a string of withdrawals could be left unable to pay its members' benefits. *Artistic Carton Co. v. Paper Industry Union–Management Pension Fund*, 971 F.2d 1346, 1348 (7th Cir. 1992).

The MPPAA shifted more of the burden of unfunded or underfunded benefits to a withdrawing employer. *Supervalu*, 155 F.4th at 916. Upon withdrawal, an employer is assessed a charge, called "withdrawal liability," that is intended to require the employer to cover its share of pension benefits that would otherwise be underfunded upon its departure. *Id.* at 916–17; accord, *M & K Employee Solutions, LLC v. Trustees of the IAM Nat'l Pension Fund*, 608 U.S. —, 146 S. Ct. — (May 21, 2026); *Chicago Truck Drivers*, 698 F.3d at 347.

The rules surrounding withdrawal liability calculations are complicated. See, e.g., *M & K Employee Solutions*, 608 U.S. at — (slip op. at 1) (calculations of withdrawal liability do not require using actuarial assumptions chosen before measurement date); *Milwaukee Brewery*, 513 U.S. at 417; *Supervalu*, 155 F.4th at 916–18. Only a few of those rules are relevant for this appeal, and we cover them in broad strokes. For starters, the MPPAA charts out two types of withdrawal liability: partial and complete. Partial withdrawal liability can be triggered when there is "a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a).

Governed by 29 U.S.C. § 1383(a), complete withdrawal liability is assessed when an employer "permanently ceases to have an obligation to contribute under the plan."

The MPPAA provides several methods for plan sponsors to calculate withdrawal liability. See 29 U.S.C. § 1391. The effective date of withdrawal plays a role, at least in the background, in determining the ultimate withdrawal liability. Section 1391 instructs the plan sponsor to calculate liability "not as of the day of withdrawal, but *as of the last day of the plan year preceding the year during which the employer withdrew*—a day that could be up to a year earlier." *Milwaukee Brewery*, 513 U.S. at 417–18 (emphasis in original); accord, *M & K Employee Solutions*, 608 U.S. at —, slip op. at 2–3. To illustrate how this works, in a variation of the Supreme Court's example in *Milwaukee Brewery*, suppose that a plan operates on a calendar-year basis. *Id.* at 418. If an employer withdrew from the plan in 2025, its withdrawal liability calculation should be the same, based on the plan's status as of December 31, 2024, regardless of whether the actual withdrawal occurred on January 1, 2025, or December 31, 2025.

For now, one final background detail. The MPPAA requires a withdrawing employer to pay up once the plan calculates and demands payment of the employer's withdrawal liability. See 29 U.S.C. § 1382. In case of a dispute over the bill, the MPPAA provides for arbitration. See § 1401(a). Until the arbitrator's final decision, the employer has no choice but to make the demanded payments. *Central States, Southeast & Southwest Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 608 (7th Cir. 2000). The statute imposes this obligation. § 1401(d).

B.  *Facts on Summary Judgment*

The Central States, Southeast and Southwest Areas
Pension Fund is a multiemployer pension plan that serves
union members of the International Brotherhood of Teamsters
who work in the midwestern United States. See *Safeway*, 229
F.3d at 607. The pension plan is established and governed by
its Trust Agreement, the Labor Management Relations Act
(LMRA), 29 U.S.C. § 186(c)(5), and the Employee Retirement
Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. The plan
is administered by eight Trustees—four appointed by the
union and four appointed by employers.[1]

Penske was one of the plan's participating employers.
Penske operates a fleet of trucks nationwide for leasing and
rental. For years, Penske made contributions to Central States
pursuant to ten separate collective-bargaining agreements on
behalf of ten bargaining units, including, as relevant here,
Local 745, which represents Penske's employees in Dallas,
Texas.

The most recent collective-bargaining agreement between
Local 745 and Penske was set to expire on March 1, 2021.
Penske and Local 745 negotiated for a one-year extension of
the agreement so that it would instead expire on March 1,
2022. Under the Trust Agreement, an agreement like the
extension was contingent upon Central States' approval. But
in December 2020, not long after the extension was submitted
for approval, Central States rejected the extension, forcing
Penske and Local 745 to renegotiate a new collective-
bargaining agreement. At that point, approximately six other

---

[1] The Trust Agreement appears in this record in Central States'
Separate Appendix at pages 1–41.

Penske bargaining units had collective-bargaining agreements that would expire in 2022.

In the fall of 2021, Central States became troubled by what it could see looming on the horizon. If Penske succeeded in lining up all ten collective-bargaining agreements to expire in 2022, it could withdraw all the bargaining units that same year, effecting a complete withdrawal. If the agreements expired on their initial expiration dates, staggered over several years, Penske would be on the hook for at least one partial withdrawal liability assessment on top of an eventual complete withdrawal. The difference, as both Penske and Central States agree, amounts to tens of millions of dollars.

In October 2021, ahead of a Trustees meeting, Central States notified Penske of its concerns. Central States also offered a proposal: Central States would agree to extend the agreement between Local 745 and Penske to 2022, but only if Penske accepted that any withdrawal of Local 745 in 2022 would be treated as a 2021 withdrawal. During an investigation into Penske's actions, Penske insisted that the lining up of the expiration dates was "not the result of any ill intent or grand design" but was due to the COVID-19 pandemic "and all the uncertainty that came with it."

C. *District Court Proceedings*

Sensing its position was getting little traction before the Trustees, Penske brought the dispute to federal court. In October 2021, Penske filed this lawsuit in the Northern District of Illinois. Penske sought a TRO to prohibit any expulsion of Local 745 from the plan. It also sought preliminary and permanent injunctive relief, as well as a

declaratory judgment that Central States had no authority under the Trust Agreement to expel Local 745.

The timing of the lawsuit meant that federal court proceedings were underway before the Trustees had made a final decision on Local 745. On December 14, 2021, two months after this lawsuit was filed, the Trustees ultimately and unanimously decided to terminate the participation of Local 745, effective December 25, 2021, unless Penske agreed by December 22, 2021 "that a 2022 withdrawal of the Local 745 group will be treated as a 2021 withdrawal." Penske did not accept that proposal.

On December 24, 2021, however, the district court entered a TRO for Penske, preliminarily finding that the Trustees might have exceeded their authority under a potentially applicable version of the Trust Agreement. Critically, the district court reasoned that the balance of harms weighed heavily in Penske's favor, given its finding that Penske sufficiently showed that any injury from the expulsion would be irreparable. In February 2022, Central States filed amended counterclaims. In addition to attorney fees, Central States sought a declaratory judgment that the Trustees' termination of Penske was effective on December 25, 2021. On April 6, 2022, the district court denied Penske's motion for a preliminary injunction and vacated the TRO. The month before, Penske had withdrawn all its other bargaining units from Central States' plan.

This appeal reviews a district court decision from later in the litigation. After discovery, in March 2025, the district court granted Central States summary judgment on Penske's claim, concluding that Central States had the authority to expel Local 745 under the Trust Agreement and that Central States

did not make the decision arbitrarily or capriciously. In the same opinion, on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed Central States' counterclaim over Local 745's effective withdrawal date. Relying on 29 U.S.C. § 1401, the district court held that the parties must first proceed to arbitration on the dispute. The district court entered judgment for Central States and permitted Central States to seek attorney fees. *Penske Truck Leasing Co. v. Central States, Southeast & Southwest Areas Pension Plan*, 2025 WL 964539 (N.D. Ill. March 31, 2025). The parties have cross-appealed. Central States' fee petition is pending in the district court, so we need not address any fee issues now.[2]

We have federal-question jurisdiction over Penske's declaratory-judgment action under § 301(a) of the LMRA, 29 U.S.C. § 185(a), which authorizes suit for "violation[s] of contracts between an employer and a labor organization representing employees," see *Samuel C. Johnson 1988 Trust v. Bayfield County*, 520 F.3d 822, 828 (7th Cir. 2008) (jurisdiction over a declaratory-judgment action exists when action arises under federal law); *GNB Battery Technologies, Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995) (same). We review a district court's summary judgment ruling de novo, giving the non-

---

[2] Because the final judgment order did not address defendants' counterclaim for declaratory relief, we previously suspended briefing and ordered the parties to address whether we had jurisdiction over the appeals. The district court's memorandum opinion dismissed the counterclaim due to a mandatory exhaustion requirement, see Part IV, and made sufficiently clear that it "was finished with the case." *Calumet River Fleeting, Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 651 (7th Cir. 2016). We are satisfied we have appellate jurisdiction.

moving party the benefit of reasonable inferences from the evidence and resolving conflicting evidence in its favor. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021). [3]

II. *The Scope of Expulsion Authority*

Central States asserts that its authority to expel Local 745 stems from the following provision in the Trust Agreement, which we call the Expulsion Provision:

> The Trustees are authorized to reject any collective bargaining agreement, participation agreement and/or terminate the participation of an Employer (and all Employer Contributions from the Employer) whenever they determine that the agreement is unlawful and/or inconsistent with any rule or requirement for participation by Employers in the Fund and/or that the Employer is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund (including but not limited to any arrangement in which the Employer is obligated to make Employer Contributions to the Trust Fund on behalf of some but not all of the Employer's bargaining unit employees, and any arrangement in which the Employer is obligated to make Employer

---

[3] In its complaint and briefing, Penske cited ERISA as another basis for federal-question jurisdiction, but it pleaded no specific cause of action under ERISA. During oral argument, Penske conceded that it was not proceeding under ERISA, so we need not decide here whether ERISA may supply a separate cause of action or basis for jurisdiction.

Contributions to the Trust Fund at different contribution rates for different groups of the Employer's bargaining unit employees) and/or they determine that continued participation by the Employer is not in the best interest of the Fund. Any such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement shall be effective as of the date determined by the Trustees (which effective date may be retroactive to the initial date of the term of the rejected agreement) and shall result in the termination of the affected group and all Employees of the Employer in the affected group from further participation in the Fund on and after such effective date. The rejection/termination of one or more of the Employer's groups that participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund.

Trust Agreement, art. IV, § 20 ("Expulsion Provision").

Our first task on appeal is not to determine the meaning of the Expulsion Provision but to answer a logically prior issue: the proper standard of review for interpreting the Trust Agreement. Penske insists we must review the Trust Agreement de novo and should hold that Central States was not permitted to expel Local 745. On this theory, Central States was allowed to expel an employer only as a whole and only after the plan had formally terminated certain agreements with the employer. Central States argues,

however, that we should defer to the Trustees' interpretation of the Trust Agreement—which permits Central States to expel Local 745—given that the Trust Agreement grants the Trustees power to interpret the Agreement. We agree with Central States. On deferential review, we adopt the Trustees' reasonable interpretation of the Trust Agreement.[4]

A. *Standard of Review*

The Supreme Court addressed the proper standard of review for interpreting ERISA-governed plans in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). "If the trust documents give the trustee 'power to construe disputed or doubtful terms, the trustee's interpretation will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (cleaned up), quoting *Firestone*, 489 U.S. at 111. But "[i]f the plan did not give the employer or administrator discretionary or final authority to construe uncertain terms," the plan is reviewed de novo. *Firestone*, 489 U.S. at 112–13; see *id.* at 112 (explaining that, without the grant of discretionary authority to interpret an instrument, classic principles of contract interpretation apply).

---

[4] An earlier version of the Expulsion Provision did not seem to contemplate the expulsion of just a single bargaining unit. The Expulsion Provision was amended in September 2021, shortly before the investigation into Penske was underway. Penske, however, relied primarily on the earlier version in its arguments before the Trustees. Central States now says that Penske has waived any argument based on the current version of the Expulsion Provision. Relying on art. IV, § 2 of its Trust Agreement, Central States argues that Penske was required to submit all "questions or controversies … as to the construction of the language or meaning" to the Trustees. Because we affirm summary judgment on the merits, we decline to reach the waiver issue now.

The Central States Trust Agreement falls within that first category. It grants discretion to its Trustees to interpret disputed terms in the Trust Agreement and other plan documents. By its terms, "[t]he Trustees … have the power to construe the provisions of [the Trust Agreement]," and "any construction adopted by the Trustees in good faith shall be binding upon the Union, Employees, and Employers." Trust Agreement, art. IV, § 17; see *id.* ("The Trustees are vested with discretionary and final authority in construing plan documents of the Pension Fund and any other agreement."). So under *Firestone*, we review the Trustees' interpretation with deference, setting their interpretation aside only if it is unreasonable. 489 U.S. at 111.

In reaching this conclusion, we are not writing on a blank slate. Central States and related Teamster employee benefit plans are old and large and appear often in this court and others. In our case law, we have repeatedly recognized that the Central States Trust Agreement gives deference to the Trustees' reasonable interpretations of plan documents. E.g., *Manny v. Central States, Southeast & Southwest Areas Pension & Health & Welfare Funds*, 388 F.3d 241, 242 (7th Cir. 2004); *Exbom v. Central States, Southeast & Southwest Areas Health & Welfare Fund*, 900 F.2d 1138, 1141–42 (7th Cir. 1990). Nor are we an outlier. The Supreme Court and other circuits have also understood these same plan documents to require deference to the Trustees' reasonable interpretations. E.g., *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 374 n.18 (1984); *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568 (1985); *Oldenburger v. Central States Southeast & Southwest Areas Teamster Pension Fund*, 934 F.2d 171, 173 (8th Cir. 1991); *Bagsby v. Central States,*

*Southeast & Southwest Areas Pension Fund*, 162 F.3d 424, 428 (6th Cir. 1998).

The Eighth Circuit's decision in *Borntrager v. Central States Southeast & Southwest Areas Pension Fund*, 577 F.3d 913 (8th Cir. 2009), is particularly instructive. There, the court reviewed Central States' decision to expel an employer under the Trust Agreement's "adverse selection rule," a provision strikingly similar to the Expulsion Provision. *Id.* at 915–16. Central States expelled the employer because the employer decided to use independent contractors rather than hire new employees, lowering the employer's contribution rate to the plan. *Id.* at 916–17. The employer sued under LMRA § 301, arguing that the Trust Agreement did not allow the expulsion based on the use of independent contractors. *Id.* at 918; see *Borntrager v. Central States, Southeast & Southwest Areas Pension Fund*, 425 F.3d 1087, 1092 n.1 (8th Cir. 2005) (discussing subject-matter jurisdiction). The Eighth Circuit disagreed. The court recognized that Central States' interpretation required "significant weight," and under its interpretation, Central States' authority was not limited to "certain forms of employment practices." *Borntrager*, 577 F.3d at 920, quoting *Central Transport*, 472 U.S. at 568; see also *Central Hardware Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 770 F.2d 106, 110 (8th Cir. 1985) (upholding Central States' decision to reject payments from an employer, in part because the "trustees' determination … is not only supportable by a construction of the governing documents but is entitled to significant weight").

Penske sees our standard differently. Penske concedes that courts may give significant weight to trustees' interpretations—but only after a court on de novo review has

deemed the contractual language to be ambiguous. Penske relies primarily on our decision in *Central States, Southeast & Southwest Areas Pension Fund v. Waste Management of Michigan, Inc.*, where we explained that a court's "first task" in interpreting an ERISA-governed plan "is to determine whether the contract at issue is ambiguous or unambiguous." 674 F.3d 630, 634 (7th Cir. 2012), citing *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 873 (7th Cir. 2001). We were not, however, weighing in on the appropriate standard of review, and for good reason. There the focus was the *employer's* interpretation, not the trustees', and it was so unreasonable and so contrary to the plan's text that it would not survive either de novo or deferential review. See *id.* at 635–37; see also *Michels Corp. v. Central States, Southeast, & Southwest Areas Pension Fund*, 800 F.3d 411, 417 (7th Cir. 2015) ("[A] plan administrator's 'interpretation may not controvert the plain language of the document.'"), quoting *Cottillion v. United Refining Co.*, 781 F.3d 47, 55 (3d Cir. 2015). "[G]eneral language in judicial opinions," as we have here, "should be read 'as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023), quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004).[5]

---

[5] *Waste Management*, in turn, cited our decision in *Neuma, Inc. v. AMP, Inc.*, 259 F.3d at 873, for this standard. In *Neuma* and the cases it cited, however, we did not confront a clause that granted interpretive authority to a plan's trustees or administrator. See *id.*, citing *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 419–20 (7th Cir. 1998), and *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir. 1989).

We have exercised *Firestone* deference most often in disputes over benefit denials, as in *Firestone* itself. 489 U.S. at 106; see also *Bator v. District Council 4*, 972 F.3d 924, 929 (7th Cir. 2020) (where union members alleged plan trustees had breached fiduciary duties, deferring to plan trustees' interpretation of plan unless arbitrary and capricious, citing benefit-denial case). Though our dispute in this case arises from the LMRA's breach-of-contract provision, that difference provides no reason to change tack. The Supreme Court has instructed that we must look to "'principles of trust law' for guidance" in reviewing the decisions of ERISA plan administrators. *Conkright*, 559 U.S. at 512, quoting *Firestone*, 489 U.S. at 111. Under trust law, it is well settled that a trust may confer discretionary powers on a trustee, including the "power to construe the trust instrument in case of dispute or doubt." A. Hess, G. Bogert & G. Bogert, Bogert's The Law of Trusts and Trustees § 559 (2025 ed.); see also Restatement (Third) of Trusts § 71 cmt. f (A.L.I. 2007) (a settlor may "expressly grant[] a trustee the power to interpret the trust instrument (or to make a 'binding' determination of its meaning and effect) in cases of doubt or controversy"). Further, when a trustee exercises a discretionary power, trust law instructs that courts review the trustee's decision deferentially. See Bogert, The Law of Trusts § 559 ("the trustee's decision will be subject to review by the court as to its reasonableness"); Restatement (Third) of Trusts § 71 cmt. f ("the trustee's discretion is nevertheless subject to judicial review for abuse").

Two Supreme Court decisions help inform our deference here, although they both predate *Firestone*. In those cases, the Supreme Court afforded significant weight to trustees' interpretations of ERISA plan documents beyond the context

of denied benefits. In *Schneider Moving & Storage Co. v. Robbins*, Central States' trustees brought a suit in federal court to seek an audit of two employers' payroll records. 466 U.S. 364, 366 (1984). The trustees argued that they could proceed in federal court, instead of in arbitration, based on their interpretation of their authority in the Trust Agreement. The Supreme Court agreed. *Id.* at 373–74. The Trust Agreement—in particular, the same provision relevant in this case—gave the trustees discretionary authority to interpret the Trust Agreement. *Id.* at 374 n.18, quoting Trust Agreement, art. IV, § 17. Likewise, in *Central Transport*, Central States sought to audit the records of a company's employees who were not participating in the plan. 472 U.S. at 561–64. Central States rooted its audit power in the Trust Agreement, and the Supreme Court again deferred to the trustees' reasonable interpretation. *Id.* at 568, quoting Trust Agreement, art. IV, § 17.

With these principles in mind, and given the Trust Agreement's grant of interpretative authority, deferential review applies. We see no reason to disturb the Trustees' reasonable interpretation finding that they had authority to expel Local 745 without expelling all other Penske's bargaining units. The Trust Agreement contemplates the expulsion of a single bargaining unit and suggests that Central States need not formally terminate an entire agreement to expel just one bargaining unit. For example, the Expulsion Provision provides in part: "The rejection/termination of one or more of the Employer's groups that participate in the Fund under this provision shall not affect the continued participation of any other group of the Employer that participates in the Fund." The provision further refers to the "termination of the affected group" and

authorizes the Trustees to "reject any collective bargaining agreement, participation agreement and/or terminate the participation of an Employer."

To be sure, the Expulsion Provision is not a model of clarity on this point. Penske has rightly pointed out parts of the text that lend support to its interpretation. E.g., Trust Agreement, art. IV, § 20 ("The Trustees are authorized to … terminate the participation of an *Employer*[.]") (emphasis added); *id.* ("Any such rejection and/or termination by the Trustees of a collective bargaining agreement, participation agreement or other agreement … shall result in the termination of the affected group[.]"). Applying deferential review, however, we need not dig deeper once we find the Trustees' interpretation reasonable.

B. *Counterarguments*

Before moving on, we address Penske's two remaining counterarguments, both of which we find unpersuasive.

First, Penske argues that Central States' interpretation would violate 29 U.S.C. § 1394(b), which requires that certain plan rules and amendments "operate and be applied uniformly with respect to each employer." Central States' interpretation of the Trust Agreement, Penske insists, would apply differently (not "uniformly") to an employer with a single bargaining unit than to an employer with multiple bargaining units. On this theory, expelling one bargaining unit would effect a complete withdrawal for an employer with one bargaining unit but a partial withdrawal for an employer with multiple bargaining units. Section 1394(b) applies only to "plan rules and amendments authorized under [29 U.S.C. §§ 1381–1405]," which concern the methods

for calculating withdrawal liability. Section 1394(b) has not often been interpreted, but other courts have understood § 1394(b) to be so limited. See *Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Industry Pension Fund, Inc.*, 762 F.2d 1137, 1141 (1st Cir. 1985) (dicta); *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & Mc Donnell, Inc.*, 787 F.2d 128, 131 (3d Cir. 1986), aff'd by an equally divided court, *Pension Benefit Guaranty Corp. v. Yahn & McDonnell, Inc.*, 481 U.S. 735 (1987), and abrogated on other grounds by *Concrete Pipe*, 508 U.S. 602 (1993). Section 1394(b) does not apply to the situation here, which is squarely about expulsion, not the calculation of withdrawal liability.

It is not unfair, as Penske suggests, that an expulsion of one bargaining unit affects Penske differently than it would other employers. Rules often affect people differently. That does not mean the rules do not "operate … uniformly." Suppose that a state imposes a gas tax. The consequences of that tax are easily foreseeable: not everyone pays. People who own cars do; people without cars do not. Nor does everyone pay equally (some buy more gas than others). But there is nothing unfair or inherently discriminatory about such a system.

Second, Penske argues that Central States' interpretation would force Penske to violate the National Labor Relations Act (NLRA). Under the NLRA, an employer must "maintain the status quo after the expiration of a collective bargaining agreement until a new agreement is reached or until the parties bargain in good faith to impasse." *General Service Employees Union, Local No. 73 v. NLRB*, 230 F.3d 909, 913 (7th Cir. 2000), quoting *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1285 (7th Cir. 1989); see also 29 U.S.C. § 158(a)(5)

(making it an "unfair labor practice for an employer" "to refuse to bargain collectively with the representatives of his employees"); *NLRB v. Katz*, 369 U.S. 736, 743 (1962) ("We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of [29 U.S.C. § 158(a)(5)], for it is a circumvention of the duty to negotiate[.]"). Penske contends that if it cannot contribute to the pension plan on Local 745's behalf, it cannot "maintain the status quo."

Penske's premise is flawed. Expelling Local 745's participation is as close a guarantee as Penske can get that there has been an "impasse" in negotiations. See *RiverStone Group v. Midwest Operating Engineers Fringe Benefit Funds*, 33 F.4th 424, 426 n.2 (7th Cir. 2022) (defining "impasse" under federal labor law as "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless"), quoting *Laborers Health & Welfare Trust Fund for Northern Calif. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.5 (1988). Central States ended negotiations with Penske altogether. True, the National Labor Relations Board "has the exclusive authority to determine whether the employer has violated" its duty, and the Board could prove our prediction wrong. *Id.* at 430–31. Under these circumstances, however, we are satisfied that Local 745's expulsion will not force Penske into violating the law.[6]

_____

[6] Penske finds support in *Staffco of Brooklyn, LLC & New York State Nurses Ass'n*, 364 NLRB 1500 (2016), pet. denied & pet. granted, 888 F.3d 1297 (D.C. Cir. 2018). But that case provides no help. A collective-bargaining agreement had expired, and the employer terminated any further contributions to the pension plan. 364 NLRB at 1501. The National

III. *The Decision to Expel Local 745*

Assuming, as we have found, that the Trust Agreement permitted Local 745's expulsion, Penske contends in the alternative that Central States' decision was arbitrary and capricious. Penske argues, in essence, that the Trustees should have explained themselves better, should have conducted their investigation more thoroughly, and should have exercised better judgment. On deferential review, these arguments fail.[7]

Both sides invoke arbitrary-and-capricious review, so we assume without deciding that it is the proper standard. In general, when applying arbitrary-and-capricious review, we will uphold a reasonable decision even if we might not have made the same decision in the first instance. Cf. *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1049–53 (7th Cir. 1987) (ERISA benefits denial; examining arbitrary-and-capricious standard). We take care, however, not to import wholesale the standard that appears in the district court's opinion and the appellate briefs. That standard comes from our ERISA benefits-denial cases, which are governed by considerations, including fiduciary duties, that have no place here. E.g., *Cerentano v. UMWA Health & Retirement Funds*, 735

---

Labor Relations Board "assum[ed]" that the plan "would no longer accept the [employer's] contributions" and found that the parties had not "bargained to an impasse." *Id.* at 1517. Those facts appear to be meaningfully different from the facts here. Local 745 was expelled only after negotiations failed.

[7] Penske frames its arguments in much stronger language; Central States adopted that framing in its responsive brief. We need not adopt Penske's characterizations to resolve this appeal.

F.3d 976, 978, 981 (7th Cir. 2013); *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 620–21 (7th Cir. 2008).[8]

To start, ERISA demands, as a matter of statute and regulation, "certain minimum requirements … when a plan administrator denies a claim for benefits"—for example, a "full and fair review" and "adequate notice in writing" for the denial. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688–89 (7th Cir. 1992), quoting 29 U.S.C. § 1133; see also 29 C.F.R. § 2560.503-1(g) (in a benefits determination, requiring certain notice to claimant). The standard in benefits-denial cases has hard edges by design; it is an ill fit for the Trustees' expulsion decision.

On arbitrary-and-capricious review, we conclude that Central States did not err in expelling Local 745. Penske's arguments amount to minor quibbles with Central States' investigation and findings. Penske complains, for example, that Central States did not ask Penske specific follow-up questions and overlooked important factors for decision-making. Penske, however, identifies no basis for imposing such requirements on what the Trustees must consider or how the Trustees must explain their decision to expel

---

[8] Under the version of arbitrary-and-capricious review used in benefits-denial cases, courts will uphold a benefits denial if:

> (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Cerentano*, 735 F.3d at 981, quoting *Tompkins v. Central Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013).

Local 745. We have already discussed at length that the only source for authority to expel Local 745 comes from the Trust Agreement. In turn, the Trust Agreement provides few constraints on how the Trustees should exercise their expulsion authority and certainly none as demanding as Penske contends. We do not see how these arguments could meet the high bar required for reversal on deferential review.[9]

One further observation informs our skepticism. A plan sponsor like Central States has no fiduciary duty to an employer participating in its plan, even if it has such duties toward plan participants and beneficiaries. 29 U.S.C. §§ 1002(7), (8) & 1104(a)(1); accord, *Board of Trustees of Watsonville Frozen Food Welfare Trust Fund v. California Cooperative Creamery*, 877 F.2d 1415, 1418, 1422 (9th Cir. 1989) (in a multiemployer plan, "no fiduciary duty" is owed to an employer). A fiduciary may well be expected to put its principal's interests first and to make decisions with reasonable diligence. See *In re Marchiando*, 13 F.3d 1111, 1115 (7th Cir. 1994). Without such a fiduciary relationship, Central States has no obligation to let an employer minimize its withdrawal liability, let alone at the expense of plan participants and beneficiaries.

Central States and Penske are nothing more to each other than two parties to a contract, each looking out for its own best interests, and each entitled to do so. Their rights and duties regarding each other are fixed by contracts. In those

---

[9] At most, Penske cites an interrogatory response and a deposition that each describe relevant factors that the Trustees may consider before expelling an employer or a bargaining unit. Descriptions, however, are not prescriptions, and they provide us little reason to reverse the Trustees' decision on deferential review.

circumstances, Central States was not obliged to turn over every stone before deciding to expel Local 745. *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992) ("Contract law does not require parties to behave altruistically toward each other. … That philosophy may animate the law of fiduciary obligations but parties to a contract are not each other's fiduciaries.").

Penske also claims that Central States conducted a "sham" investigation. How to tell? Because, from Penske's perspective, Central States had misrepresented the status of its investigation before the district court. In a status conference on November 29, 2021, Central States' counsel said that "staff of the pension fund is sort of still investigating and looking into some facts surrounding the matter." According to Penske, this representation was false because the Trustees' November 2021 board minutes did not indicate that Central States was still collecting facts. The record suggests otherwise. By the time of its December board meeting, Central States had facts that it did not have in November. That, of course, says little about any fact-gathering or investigative work that Central States may have done internally.

We single out this argument, however, for a different reason. Penske's argument is, in essence, that Central States lied to a court. An accusation of attorney wrongdoing—that counsel had made a knowingly false statement in open court—is a serious charge. Model Rules of Professional Conduct r. 3.3 (ABA 2023). It is an accusation about someone's professional reputation, but here Penske has made the accusation seemingly and only to aid its merits argument without supporting evidence. Making this charge is not a play to be called when a party is on its back foot. Penske and other

parties tempted by this approach should think twice before making these kinds of arguments. See *Malin v. Hospira, Inc.*, 762 F.3d 552, 564–65 (7th Cir. 2014) (cautioning parties on summary judgment to avoid misrepresenting the record and opponent's legal arguments).

IV. *The Effective Withdrawal Date*

We turn now to the final issue on appeal. In the district court, Central States sought a declaration that the effective withdrawal date of Local 745 was 2021, not 2022. The district court dismissed Central States' counterclaim, concluding that the claim must first be arbitrated under 29 U.S.C. § 1401(a). The counterclaim arises from this case's unusual procedural posture and Central States' efforts to seek clarity. Though we sympathize with Central States and see how immediate consideration of the question might be more efficient, we affirm the dismissal.

To understand Central States' predicament, remember the basic facts of this case. Central States sought to prevent Penske from lining up the expiration dates of its ten collective-bargaining agreements to enable a one-time complete withdrawal from the plan in 2022. When negotiations failed, Central States sought to terminate Local 745's participation in the plan in 2021. Before the termination was effective, the district court issued a TRO that enjoined the termination. Although the district court later vacated the TRO, it did so in 2022, the year in which Central States hoped there would not be a withdrawal. Now, Central States wants the district court to turn back the clock and set Local 745's effective withdrawal date as 2021.

The threshold problem with Central States' strategy here is that it comes too soon. 29 U.S.C. § 1401 requires the issue to be arbitrated before it goes to a federal court: "Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 [withdrawal liability] shall be resolved through arbitration."

Section 1401 is a mandatory exhaustion requirement. *Banner Industries, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 875 F.2d 1285, 1288 n.2 (7th Cir. 1989); *Robbins v. Admiral Merchants Motor Freight, Inc.*, 846 F.2d 1054, 1056 (7th Cir. 1988) ("The arbitration requirement is not viewed as a jurisdictional prerequisite but rather as an administrative remedy exhaustion requirement."). When a statute requires exhaustion, we cannot consider claims that have not yet traveled Congress' approved path—which is, here, arbitration. See *Ross v. Blake*, 578 U.S. 632, 639 (2016) ("Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to.").[10]

---

[10] Before the Supreme Court's instructions in *Ross*, some courts recognized exceptions to Section 1401's mandate. E.g., *Central States, Southeast & Southwest Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371–73 (7th Cir. 1992); *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Industries*, 727 F.2d 1204, 1210 (D.C. Cir. 1984); *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 297–98 (3d Cir. 1982). Those other circuits have since characterized many of those exceptions as "narrowly cabined." *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1252 (3d Cir. 1987), quoting *Grand Union Co. v. Food Employers Labor Relations Ass'n*, 808 F.2d 66, 68 (D.C. Cir. 1987). The Third Circuit has recently reaffirmed its view that Section 1401 is subject to "rare" exceptions. *RTI Restoration Technologies, Inc. v. Int'l Painters & Allied Trades Industry Pension Fund*, 169 F.4th 140 (3d Cir. 2026).

The circumstances in this case pose no exception. The date when withdrawal liability accrues is a quintessential question for arbitration under Section 1401. E.g., *Central States, Southeast & Southwest Areas Pension Fund v. Bomar Nat'l, Inc.*, 253 F.3d 1011, 1014 (7th Cir. 2001) ("The merits of the dispute regarding withdrawal liability, including the date of its incurrence, must be referred to arbitration."); *Robbins v. Lady Baltimore Foods, Inc.*, 868 F.2d 258, 264 (7th Cir. 1989) ("[T]he question of an employer's withdrawal date from a pension fund is one which is subject to mandatory arbitration under 29 U.S.C. § 1401(a)(1)."); *Admiral Merchants*, 846 F.2d at 1055 ("Congress clearly intended all withdrawal liability disputes, including withdrawal date disputes, to be arbitrated."); *Warner-Lambert Co. v. United Retail & Wholesale Employee's Teamster Local No. 115 Pension Plan*, 791 F.2d 283, 287–88 (3d Cir. 1986) (affirming judgment that withdrawal-date dispute must proceed to arbitration).

Getting to arbitration, as prescribed by Section 1401, and later to federal court can be a lengthy process, not least because it requires a plan sponsor to have made complicated withdrawal liability calculations beforehand. The plan sponsor (here, Central States, see 29 U.S.C. § 1002(16)(B)) must take the first crack at the withdrawal liability assessment. See § 1382. Once it does so, the plan sponsor must issue a notice and demand for payment of withdrawal liability to the employer (here, Penske) "[a]s soon as practicable" after the employer's withdrawal. § 1399(b)(1). If the employer wishes to contest the assessment, it must first complain to the plan sponsor within 90 days. § 1399(b)(2)(A).

---

Given the strong language in *Ross*, however, we decline to find the case before us is subject to such an exception.

If the disagreement still cannot be sorted out, either the plan sponsor or the employer may initiate arbitration under Section 1401(a)(1). Meanwhile, the employer is expected to pay its installments of withdrawal liability based on the plan sponsor's calculations until the final decision of the arbitrator. § 1401(d). If arbitration is not helpful, then either party can ask a federal court to weigh in on the dispute, reviewing questions of law de novo and conclusions of fact deferentially. § 1401(b)(2); see *Artistic Carton Co.*, 971 F.2d at 1348.

Central States has asserted this counterclaim before any of this process has happened. Since April 2022, when the TRO was vacated, there has been no withdrawal liability assessment by Central States, no payment of withdrawal liability, and no other discernible trigger that would begin arbitration. The district court did not err by declining to take up Central States' question now.

To escape Section 1401's mandatory exhaustion requirement, Central States argues that because there has been no "determination made" of withdrawal liability, Section 1401 is not in play. We decline to interpret Section 1401 to require a determination to have been finalized for it to apply. This reading of the statute's text would threaten to hollow out the arbitration requirement altogether. It is difficult to see why Congress would have built such an easy loophole. If we were to adopt Central States' position, the result would be troubling. Employers would have an incentive to race to enjoin plan sponsors before they assess withdrawal liability, and plan sponsors would hang back from making any assessment at all to keep the federal courthouse doors open. That scenario is quite different from what Section 1401 contemplates.

Nor can Central States avoid arbitration by characterizing its claim as having to do with contributions and *not* withdrawal liability. Central States received money from Penske between December 25, 2021 (when Central States planned for Local 745's termination) and March 26, 2022 (before the TRO was vacated). Now, Central States says that it wants to know how to treat that money and "to what extent Penske's employees are entitled to pension credit" in that post–December 25 period. But Central States' request for declaratory relief here can be rephrased in a much simpler way: It wishes to know when Penske's obligation to contribute ended. That is a withdrawal question. See 29 U.S.C. § 1385(a)(2) (defining partial withdrawal as "a partial cessation of the employer's contribution obligation").[11]

Central States' strongest argument is rooted in the unusual procedural posture of this case. Because the expulsion was put on hold by a now-vacated court order, Central States believes the district court, rather than an arbitrator, is better positioned to interpret its own order. On a blank slate, this argument might have more force. As we have described, however, the parties and we are hemmed in by Section 1401's mandate of arbitration. Arbitration has not

---

[11] Central States criticizes the district court for relying on *Central States, Southeast & Southwest Areas Pension Fund v. Rail Terminal Services LLC*, No.18-cv-2372, 2019 WL 2326002, at *2 (N.D. Ill. May 31, 2019). We find no error in the district court's use of *Rail Terminal* as persuasive authority. In that case, the district court similarly found that Central States' claim would, in essence, require the court to determine an employer's withdrawal date, even if Central States had styled the claim differently. *Rail Terminal*, 2019 WL 2326002, at *3.

happened, so no court can hear Central States' counterclaim now.

That is enough to end our analysis. We may be tempted under these circumstances to take into account equitable considerations (as we may in judge-made exhaustion doctrines, *Ross*, 578 U.S. at 639), but they would not be of much help. The MPPAA promises Central States and Penske their day in court—they will simply have to follow the winding path through arbitration before going to court.

In sum, the district court was correct to dismiss Central States' counterclaim as not yet ripe. Before we can hear the dispute over the date of withdrawal in federal court, the parties must proceed to arbitration. Central States must naturally take all the steps necessary to do so.

*     *     *

We AFFIRM the district court's grant of summary judgment for Central States and its dismissal without prejudice of Central States' counterclaim for arbitration. We REMAND this case for further proceedings on attorney fee issues and any other appropriate matters consistent with this opinion. We DENY Central States' request that we instruct the district judge to retain its jurisdiction for a later case.